IN RE the COMMITMENT OF Steven J. BURGESS:

STATE of Wisconsin, Petitioner-Respondent,

v.

Steven J. BURGESS, Respondent-Appellant-Petitioner.

Supreme Court

*No. 00–3074. Oral argument April 30, 2003.—Decided June 27, 2003.*

2003 WI 71

(Also reported in 665 N.W.2d 124.)

† Motion for reconsideration denied 9-24-03.

357

For the respondent-appellant-petitioner there were briefs and oral argument by *Steven P. Weiss,* assistant state public defender.

For the petitioner-respondent the cause was argued by *Sandra L. Nowack,* assistant attorney general, with whom on the brief was *Peggy A. Lautenschlager,* attorney general.

¶ 1. WILLIAM A. BABLITCH, J. Steven Burgess (Burgess), an enrolled member of the Lac du Flambeau Band of Lake Superior Chippewa Indians,

petitions this court for review of a court of appeals' decision that committed Burgess as a sexually violent person under chapter 980 of the Wisconsin Statutes. *State v. Burgess,* 2002 WI App 264, 258 Wis. 2d 548, 654 N.W.2d 81. We review three issues relating to Burgess's commitment under chapter 980: (1) whether the circuit court had jurisdiction to conduct chapter 980 proceedings since Burgess is an enrolled tribal member and committed the underlying sexual offense on an Indian reservation; (2) whether there was sufficient evidence for the jury to find that Burgess is a "sexually violent person" as defined in Wis. Stat. § 980.01(7) (2001–02)[1]; and (3) whether Burgess's right to equal protection was violated because chapter 980 proceedings do not have the same confidentiality as proceedings under chapter 51 of the Wisconsin Statutes.

¶ 2. We conclude that the circuit court had jurisdiction to conduct chapter 980 proceedings to commit Burgess since the conduct at the heart of chapter 980, both past and potential future conduct, is prohibited and not merely regulated; therefore, the State of Wisconsin (State) has jurisdiction pursuant to Public Law 83–280 (PL-280). We also conclude that there was sufficient evidence for the jury to find that Burgess is a "sexually violent person" for purposes of civil commitment under chapter 980. Finally, we conclude that Burgess was not denied equal protection of the law because there is a rational basis for the legislature to treat the confidentiality of chapter 980 proceedings differently than chapter 51 proceedings. Accordingly, we affirm the decision of the court of appeals.

---

[1] All references are to the 2001–02 version of the Wisconsin Statutes unless otherwise indicated.

## I. FACTS AND PROCEDURAL HISTORY

¶ 3. The relevant facts are undisputed. Burgess is an enrolled member of the Lac du Flambeau Band of Lake Superior Chippewa Indians (Lac du Flambeau Tribe). On February 24, 1995, Burgess was convicted of attempted second-degree sexual assault of a child, in violation of Wis. Stat. §§ 939.32(1) and 948.02(2) (1993–94) in the Circuit Court for Vilas County, Judge James B. Mohr, presiding. Burgess committed the sexual assault on the Lac du Flambeau Reservation, where he resided. Upon his conviction, Burgess was incarcerated at the Oshkosh Correctional Institution. Burgess was scheduled for release on November 17, 1998. That same day, the State filed a petition pursuant to chapter 980 seeking to commit Burgess as a sexually violent person. On November 19, 1998, a probable cause hearing was held by the circuit court. Based on the testimony presented at the hearing, the circuit court found probable cause that Burgess is a "sexually violent person" within the meaning of Wis. Stat. § 980.01(7) (1993–94), and Burgess was transferred to the Mendota Mental Health Institute. As provided under Wis. Stat. § 980.05(2) (1993–94), Burgess requested a jury trial for the chapter 980 proceedings.

¶ 4. Burgess filed a pre-trial motion to dismiss the petition on the grounds that the circuit court lacked jurisdiction because he is an enrolled tribal member and committed the sexually violent offense on the Lac du Flambeau Reservation. In response, the circuit court contacted the Lac du Flambeau tribal court, which declined jurisdiction because the Lac du Flambeau Tribe had not yet passed an ordinance to address the commitment of sexually violent persons, such as Burgess. Thus, Judge Mohr stated that he "accept[ed] the letter from the tribe that is indicating that they are not

361

in a position . . . to hear this case at this time." Burgess also made a motion to have the chapter 980 proceedings closed to the public. The circuit court denied Burgess's motion, concluding that it did not have authority to close the proceedings and that public safety concerns countenanced against doing so.

¶ 5. In August 2000, a jury trial was held to determine whether Burgess is a sexually violent person. Both the State and Burgess presented expert witnesses who testified as to their clinical evaluations of Burgess. The jury found Burgess to be a sexually violent person, and the circuit court ordered Burgess committed to the Department of Health and Family Services. Burgess filed post-judgment motions for a new trial and/or relief from judgment, or alternatively, for a dispositional hearing for immediate supervised release and/or a right to petition for release after six months. The circuit court denied the motions, and Burgess appealed.

¶ 6. Burgess raised several issues at the court of appeals, including the following: (1) whether the circuit court had jurisdiction to conduct the commitment proceedings because he is an enrolled member of the Lac du Flambeau Tribe and committed the underlying criminal offense on the Lac du Flambeau Reservation; (2) whether his commitment violated due process because there was insufficient evidence to support the jury's finding that he is a sexually violent person; and (3) whether the circuit court should have granted him the same confidentiality as afforded under chapter 51 of the Wisconsin Statutes. The court of appeals affirmed the judgment and order of the circuit court, concluding that the State has jurisdiction over chapter 980 proceedings involving tribal members who commit sexually violent offenses on Indian reservations by virtue of PL-280. The court of appeals also concluded that there

was sufficient evidence for the jury to find that Burgess is a sexually violent person. Finally, the court of appeals concluded that the State has a compelling interest to conduct open hearings for chapter 980 proceedings; therefore, Burgess's right to equal protection was not violated.

¶ 7. Burgess petitioned this court for review of these three issues, which was granted on January 14, 2003.

## II. STANDARDS OF REVIEW

██

¶ 8. Whether a circuit court has jurisdiction to commit an enrolled tribal member, who has committed a sexually violent offense on an Indian reservation, as a sexually violent person under chapter 980, presents a question of law that this court reviews de novo.

██

¶ 9. The review of whether there was sufficient evidence to prove that an individual is a sexually violent person, who is subject to commitment, is based on the criminal standard of review. *State v. Kienitz,* 227 Wis. 2d 423, 434, 597 N.W.2d 712 (1999). We may not reverse a commitment on the basis of insufficient evidence unless "the evidence, viewed most favorably to the state and the conviction, is so insufficient in probative value and force that it can be said as a matter of law that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt." *State v. Poellinger,* 153 Wis. 2d 493, 501, 451 N.W.2d 752 (1990); *see also Kienitz,* 227 Wis. 2d at 434. Therefore,

> [i]f any possibility exists that the trier of fact could have drawn the appropriate inferences from the evi-

dence adduced at trial to find [that the defendant is a sexually violent person], an appellate court may not overturn a verdict even if it believes the trier of fact should not have found [the defendant to be a sexually violent person] based on the evidence before it.

*Kienitz,* 227 Wis. 2d at 434–35 (quoting *Poellinger,* 153 Wis. 2d at 507). " 'It is only when the evidence that the trier of fact has relied upon is inherently or patently incredible that [an] appellate court will substitute its judgment for that of the fact finder . . . .' " *State v. Curiel,* 227 Wis. 2d 389, 420, 597 N.W.2d 697 (1999) (quoting *Gauthier v. State,* 28 Wis. 2d 412, 416, 137 N.W.2d 101 (1965)). It is up to the jury, as the trier of fact, to determine the weight and credibility of the evidence and testimony presented, and to resolve any conflicts in the evidence. *Id.* at 435 (citing *State v. Gomez,* 179 Wis. 2d 400, 404, 507 N.W.2d 378 (Ct. App. 1993)).

¶ 10. The issue of whether chapter 980 proceedings violate equal protection because they do not have the same confidentiality as proceedings under chapter 51 presents a question of law that this court reviews de novo. *Nankin v. Vill. of Shorewood,* 2001 WI 92, ¶ 10, 245 Wis. 2d 86, 630 N.W.2d. 141. In reviewing a challenge to the constitutionality of a statute, "[w]e presume that the statute is constitutional . . . . Any doubt must be resolved in favor of the constitutionality of the statute." *Id.* (citing *Aicher v. Wisconsin Patients Comp. Fund,* 2000 WI 98, ¶ 18, 237 Wis. 2d 99, 613 N.W.2d 849). " 'Equal protection does not require that all persons be dealt with identically, but it does require that a distinction made have some relevance to the purpose for which the classification is made.' " *State v. Post,* 197 Wis. 2d 279, 321, 541 N.W.2d 115 (1995) (citing *Bax-*

*strom v. Herold,* 383 U.S. 107, 111 (1966)). In cases where a statutory classification does not involve a suspect class or a fundamental interest, the classification will be upheld if there is any rational basis to support it. *Milwaukee Brewers v. DHSS,* 130 Wis. 2d 79, 98, 387 N.W.2d 254 (1986). Thus, "[t]he basic test is not whether some inequality results from the classification but whether there exists a rational basis to justify the inequality of the classification." *Id.* at 99.

## III. ANALYSIS

### A. PUBLIC LAW 280 AND COMMITMENT OF SEXUALLY VIOLENT PERSONS UNDER CHAPTER 980

¶ 11. We begin by analyzing whether the circuit court had jurisdiction to commit Burgess, an enrolled tribal member, as a sexually violent person under chapter 980, where the underlying criminal offense was committed on the Lac du Flambeau Reservation. To determine whether the State has jurisdiction over a tribal member, like Burgess, for purposes of chapter 980 commitment proceedings, we look to the analytical framework developed by the United States Supreme Court. *County of Vilas v. Chapman,* 122 Wis. 2d 211, 214, 361 N.W.2d 699 (1985); *State v. Webster,* 114 Wis. 2d 418, 431–32, 338 N.W.2d 474 (1983).

¶ 12. According to the U.S. Supreme Court, " '[s]tate laws generally are not applicable to tribal Indians on an Indian reservation except where Congress has expressly provided that State laws shall apply.' " *McClanahan v. Ariz. State Tax Comm'n,* 411 U.S. 164, 170–71 (1973) (citation omitted); *see also Worcester v. Georgia,* 31 U.S. (6 Pet.) 515, 561 (1832). In 1953, Congress enacted PL-280, which expressly granted certain states, including Wisconsin, jurisdiction

over criminal offenses and certain civil causes of action arising in "Indian country."[2] 18 U.S.C. § 1162 (2000); 28 U.S.C. § 1360 (1993). The grant of criminal jurisdiction under PL-280 broadly covers criminal offenses committed by or against Indians within Indian country. 18 U.S.C. § 1162 (2000). However, we must also examine the civil jurisdiction granted by PL-280 since chapter 980 involves involuntary civil commitments. Unlike the criminal jurisdiction covered by PL-280, the grant of civil jurisdiction is more limited. 28 U.S.C. § 1360 (1993). The grant of civil jurisdiction under PL-280 has been interpreted as applying to private civil litigation involving reservation Indians in state court, but not general state civil regulatory authority. *California v. Cabazon Band of Mission Indians,* 480 U.S. 202, 208–09 (1987); *Bryan v. Itasca County,* 426 U.S. 373, 385 (1976). The civil jurisdiction granted under PL-280 provides:

> (a) Each of the States listed in the following table shall have jurisdiction over civil causes of action between Indians or to which Indians are parties which arise in the areas of Indian country listed opposite the

---

[2] "Indian country" is defined as

(a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

18 U.S.C. § 1151 (2000).

This definition of "Indian country" applies in the context of both criminal and civil jurisdiction. *DeCoteau v. Dist. County Court,* 420 U.S. 425, 427 n. 2 (1975).

name of the State to the same extent that such State has jurisdiction over other civil causes of action, and those civil laws of such State that are of general application to private persons or private property shall have the same force and effect within such Indian country as they have elsewhere within the State:

. . . .

Wisconsin . . . . All Indian country within the State

. . . .

(c) Any tribal ordinance or custom heretofore or hereafter adopted by an Indian tribe, band, or community in the exercise of any authority which it may possess shall, if not inconsistent with any applicable civil law of the State, be given full force and effect in the determination of civil causes of action pursuant to this section.

28 U.S.C. § 1360 (1993). Since Wisconsin is a mandatory PL-280 state, all Indian country in Wisconsin is subject to PL-280, except for the Menominee Tribe, which is specifically exempt.[3]

¶ 13. The U.S. Supreme Court has stated that "[t]he primary concern of Congress in enacting Pub. L. 280 . . . was with the problem of lawlessness on certain Indian reservations, and the absence of adequate tribal institutions for law enforcement." *Bryan,* 426 U.S. at 379. "The Act plainly was not intended to effect total assimilation . . . ." *Cabazon,* 480 U.S. at 208. Consequently, PL-280 does not grant "general civil regulatory

---

[3] The federal government terminated federal recognition of the Menominee Tribe in 1954; however, the Tribe was subsequently restored in 1973 and is not subject to PL-280. *See State v. Webster,* 114 Wis. 2d 418, 421–27, 338 N.W.2d 474 (1983).

power over Indian reservations [because it] would result in the destruction of tribal institutions and values."
*Id.*

> Accordingly, when a State seeks to enforce a law within an Indian reservation under the authority of Pub. L. 280, it must be determined whether the law is criminal in nature, and thus fully applicable to the reservation under § 2, or civil in nature, and applicable only as it may be relevant to private civil litigation in state court.

*Id.*

¶ 14. In *Cabazon,* the U.S. Supreme Court approved of the Ninth Circuit's characterization of the distinction as "criminal/prohibitory" and "civil/regulatory." *Id.* at 209 (citing *Barona Group of Capitan Grande Band of Mission Indians v. Duffy,* 694 F.2d 1185 (9th Cir. 1982)).

> [I]f the intent of a state law is generally to prohibit certain conduct, it falls within Pub. L. 280's grant of criminal jurisdiction, but if the state law generally permits the conduct at issue, subject to regulation, it must be classified as civil/regulatory and Pub. L. 280 does not authorize its enforcement on an Indian reservation. The shorthand test is whether the conduct at issue violates the State's public policy.

*Id.* However, the Court explicitly recognized that some state statutes are "not so easily categorized" and that "[i]t is not a bright-line rule . . . ." *Id.* at 208, 210. In *Cabazon,* the Court concluded that since California did not prohibit all forms of gambling, but rather permitted certain gambling activities, the California gambling statute at issue was a regulation rather than a prohibition. Consequently, the Court held that the statute could not be enforced by the State within the Cabazon and Morogno Reservations. *Id.* at 210–12.

¶ 15. In employing the analysis set forth in *Cabazon,* the Ninth Circuit stated that "[t]he inquiry prescribed in *Cabazon* is . . . one of the statute's intent and not simply its label." *Quechan Indian Tribe v. McMullen,* 984 F.2d 304, 307 (1993). " '[I]n an inquiry such as this we must examine more than the label itself to determine the intent of the State and the nature of the statute . . . .' " *Id.* (quoting *Confederated Tribes v. Washington,* 938 F.2d 146, 148 (9th Cir. 1991)). In *Quechan,* the Ninth Circuit held that a California fireworks law was criminal/prohibitory instead of civil/regulatory, and was therefore enforceable on the Fort Yuma Indian Reservation. *Id.* at 308. The Ninth Circuit concluded that the fireworks law was prohibitory rather than regulatory even though the law was codified as a civil enactment and was referred to by the California Attorney General as "regulatory." *Id.* at 307. Despite being a civil enactment, the court in *Quechan* reasoned that

> [t]he possession of fireworks is not the same situation encountered in other regulatory schemes such as hunting or fishing . . . . The purpose of such statutes is to regulate the described conduct and to generate revenues. In contrast, the purpose of the fireworks laws is not to generate income, but rather to prohibit their general use and possession in a legitimate effort to promote the safety and health of all citizens.

*Id.*

¶ 16. This case is of the kind alluded to in *Cabazon* and *Quechan:* it is not easily categorized. Chapter 980 commitments for sexually violent persons do not squarely fall under one category within the criminal/prohibitory—civil/regulatory dichotomy. Therefore, in accordance with the U.S. Supreme Court's analysis in *Cabazon,* we examine the "nature and intent

of the state law at issue" and "whether the conduct at issue violates the State's public policy." *Cabazon,* 480 U.S. at 209–10.

¶ 17. This court has held that the involuntary commitment of an individual, who is found to be a "sexually violent person" under chapter 980, is "civil" rather than "criminal" based on the purposes of the chapter to provide treatment and to protect the public. *State v. Carpenter,* 197 Wis. 2d 252, 267, 541 N.W.2d 105 (1995). However, notwithstanding the "civil" commitment allowed under chapter 980, only individuals who have been convicted of certain crimes—"sexually violent offenses," may be committed pursuant to chapter 980. In addition, the primary purpose of chapter 980 is to protect the public from future acts of sexual violence.

¶ 18. Chapter 980 permits the involuntary commitment of "only the most dangerous of sexual offenders—those whose mental condition predisposes them to reoffend." *Post,* 197 Wis. 2d at 307. The "principal purposes of ch. 980 are the protection of the public and the treatment of convicted sex offenders who are at a high risk to reoffend in order to reduce the likelihood that they will engage in such conduct in the future." *Carpenter,* 197 Wis. 2d at 271.

¶ 19. The conduct addressed by chapter 980 commitments, both past as well as potential future conduct, is contrary to Wisconsin's public policy. The commission of sexually violent offenses is not permitted conduct that is regulated by the State; rather, it is prohibited conduct that is "inimical to the health and safety of its citizens . . . ." *State ex rel. Lykins v. Steinhorst,* 197 Wis. 2d 875, 887, 541 N.W.2d 234 (1995). The "civil" proceedings under chapter 980 are enveloped on both sides by

criminal conduct: (1) only persons who have committed sexually violent offenses are eligible for commitment under chapter 980 and (2) chapter 980 commitments are intended to protect the public by preventing future acts of sexual violence. Thus, the conduct at the heart of chapter 980—both past and potential future conduct—is prohibited and not merely regulated by the State. Therefore, we conclude that the circuit court had jurisdiction to conduct chapter 980 proceedings for the civil commitment of Burgess pursuant to PL-280.

■

¶ 20. In addition, even if chapter 980 is strictly construed as a "civil" law in its entirety, it is civil/adjudicatory rather than civil/regulatory, and therefore falls within PL-280's grant of civil jurisdiction to the State. The U.S. Supreme Court has stated that the civil jurisdiction granted under PL-280 was "primarily intended to redress the lack of adequate Indian forums for resolving private legal disputes between reservation Indians, and between Indians and other private citizens, by permitting the courts of the States to decide such disputes . . . ." *Bryan,* 426 U.S. at 383. The *Bryan* court noted a law review article, which claimed that the civil jurisdiction affected by PL-280 includes areas such as " 'contract, tort, marriage, divorce, insanity, descent, etc., but would not include laws . . . such as the power to tax, grant franchises, etc.' " *Id.* at 384 n. 10 (quoting Daniel H. Israel & Thomas L. Smithson, "Indian Taxation, Tribal Sovereignty and Economic Development," 49 N.D. L. Rev. 267, 296 (1973)). Thus, " 'Congress intended "civil laws" to mean those laws which have to do with private rights and status.' " *Id.* (quoting Israel & Smithson, 49 N.D. L. Rev. at 296).

¶ 21. In this case, the adjudication of Burgess's mental health is a status determination, which is more similar to adjudications like those involving insanity, rather than regulations such as the power to tax. Furthermore, the tribal court in this case declined to accept jurisdiction because the Lac du Flambeau Tribe had not yet passed an ordinance regarding the commitment of sexually violent persons. Thus, the appropriateness of State jurisdiction is bolstered since one of the stated purposes of PL-280 was to "redress the lack of adequate Indian forums . . . ." *Id.* at 383.

## B. SUFFICIENCY OF EVIDENCE

¶ 22. We next address Burgess's claim that his commitment violated due process because the State failed to prove that there is a substantial probability that he will reoffend due to his mental disorders, contrary to this court's decision in *State v. Laxton,* 2002 WI 82, 254 Wis. 2d 185, 647 N.W.2d 784. In support of his position, Burgess argues that actuarial instruments, which were used for his evaluations, were not relevant for determining whether he will reoffend due to a mental disorder. In general, the actuarial instruments that were used provided a score regarding Burgess's risk of reoffending based on certain factors such as his age, prior sex offenses, and characteristics of the victim. In response, the State contends that the evidence presented at trial, aside from the actuarial data, clearly established that there is a substantial probability that Burgess will reoffend due to his mental disorders and that he has serious difficulty controlling his behavior. Upon reviewing the record and the testimony offered at trial, we agree with the State that there was sufficient

evidence for the jury to find that Burgess is a sexually violent person, even without considering the actuarial data that Burgess complains of.

¶ 23. In order to commit an individual under chapter 980, a jury must find that the individual is a "sexually violent person." Wis. Stat. § 980.01(7). A "sexually violent person" is defined as

> a person who has been convicted of a sexually violent offense, has been adjudicated delinquent for a sexually violent offense, or has been found not guilty of or not responsible for a sexually violent offense by reason of insanity or mental disease, defect or illness, and *who is dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence.*

Wis. Stat. § 980.01(7) (emphasis added).

¶ 24. In *Laxton,* this court concluded that the defendant in that case had a mental disorder, which created a "substantial probability that he [would] engage in acts of sexual violence. . . . This nexus between the mental disorder and the level of dangerousness distinguishes [the defendant] as a dangerous sexual offender who has serious difficulty controlling his behavior, from the dangerous but typical recidivist." *Laxton,* 254 Wis. 2d 185, ¶ 27.

¶ 25. Burgess challenges his commitment based on the use of actuarial instruments in his chapter 980 commitment proceeding because they did not take into account his mental health. Consequently, Burgess contends that the instruments are irrelevant for chapter 980 proceedings because there must be a nexus between an offender's mental disorder and the probability of committing sexually violent acts in the future. Although actuarial instruments were utilized by expert

witnesses for both the State and Burgess, there was sufficient evidence, aside from the actuarial data, for the jury to reasonably find that there is a substantial probability that Burgess will reoffend due to his mental disorders. Accordingly, the use of actuarial data in Burgess's chapter 980 proceedings does not affect our decision.

¶ 26. One of the State's expert witnesses, psychologist Linda Nauth, conducted a psychological examination of Burgess. Ms. Nauth utilized and reviewed various sources of information about Burgess, including his social services file, his clinical services file, his sex offender program reports, and data from actuarial instruments (e.g. Rapid Risk Assessment for Sex Offender Recidivism or RRASOR). She also consulted with other professionals involved with Burgess's care and treatment, and conducted a two-hour clinical interview with Burgess. Based on this variety of information, Nauth reached the following conclusion and recommendation:

> This clinician came to the opinion to a reasonable degree of psychological certainty that Mr. Burgess suffers from pedophilia which is an acquired or congenital condition affecting his emotional or volitional capacity which predisposes him to commit sexually violent acts as defined by Chapter 980. In addition, his diagnosis of alcohol dependence and anti-social personality disorder are acquired or congenital conditions which combined with pedophilia also affects his emotional or volitional capacity which predisposes him to commit sexually violent acts as defined by Chapter 980.
>
> It is also my opinion that each of these mental disorders, separately and together as exhibited by Mr. Burgess, create a substantial probability that he will engage of acts of sexual violence. Finally, the

preponderance of risk factors which apply to Mr. Burgess, are indicative that he is at a substantial risk to commit another sexual offense.

¶ 27. Another of the State's expert witnesses, Dr. Sheila Fields, also evaluated Burgess based on several sources of information, including files on Burgess from the Department of Corrections and the Mendota Mental Health Institute, data from actuarial instruments, discussions with other professionals involved with Burgess's care and treatment, and a three-hour interview with Burgess. Based on her evaluation, Dr. Fields reached the following conclusion and recommendation:

> It is my professional opinion, to a reasonable degree of scientific certainty, that Mr. Burgess manifests six diagnosed disorders: Pedophilia, Alcohol Abuse, Cocaine Abuse, Cannabis Abuse, Amphetamine Abuse, and Antisocial Personality Disorder. The diagnoses of Pedophilia and Antisocial Personality Disorder constitute mental disorders as defined by Chapter 980, and are acquired or congenital conditions affecting Mr. Burgess' emotional or volitional capacity predisposing him to commit sexually violent acts, as defined by Chapter 980.
>
> . . . .
>
> It is my professional opinion, then, to a reasonable degree of scientific certainty, that Mr. Burgess' mental disorders create a substantial probability that he will commit a sexually violent act as defined by Chapter 980, and that he is therefore a proper subject for commitment as a sexually violent individual.

¶ 28. The evaluations conducted by Dr. Fields and Ms. Nauth included a variety of sources of information about Burgess; the actuarial data was only one of many indicators regarding Burgess's likelihood to reoffend.

Furthermore, the testimony of both Dr. Fields and Ms. Nauth at trial supported their respective conclusions and recommendations from their evaluations of Burgess. Dr. Fields testified that Burgess's pedophilia and psychopathy suggested a higher risk of recidivism, and that Burgess seems to have "a very difficult problem with impulse control . . . ." Even Burgess's expert witness, Dr. Charles Lodl, concluded in his evaluation of Burgess that "it is my opinion that Mr. Burgess does present with [sic] a mental disorder which predisposes him to acts of sexual violence." However, Dr. Lodl believed that Burgess's risk for reoffending was "moderate" as opposed to "substantial."

¶ 29. Nevertheless, Burgess claims that the expert testimony presented at trial, specifically that of Dr. Fields, established that he is able to control his behavior. Consequently, Burgess contends that the State did not prove that he cannot control his behavior due to his mental disorders as required for commitment under chapter 980. Burgess points to testimony of Dr. Fields, where she agreed that Burgess might be able to conform his conduct to the requirements of the law and that there was not "anything in the record indicating he doesn't know the difference between right and wrong." However, there is a critical difference between potentially being able to conform one's conduct to the requirements of law (i.e. knowing right from wrong) and actually doing so. Even though Dr. Fields thought that Burgess might know right from wrong and might be able to abide by the law, she ultimately concluded that Burgess would *not* in fact conform his behavior to the law. Specifically, Dr. Fields concluded that "Burgess' mental disorders create a substantial probability that he will commit a sexually violent act" in the future.

376

¶ 30. In sum, based on the in-depth and multi-faceted evaluations performed by the State's expert witnesses and the testimony presented at trial, we conclude that there was sufficient evidence, aside from the actuarial data, for the jury to reasonably find that Burgess is a "sexually violent person" under chapter 980.

## C. EQUAL PROTECTION AND CONFIDENTIALITY OF CHAPTER 980 PROCEEDINGS

¶ 31. Burgess also raises an equal protection issue.[4] Burgess contends that equal protection requires that individuals who are subject to chapter 980 proceedings should have the same rights to privacy and confidentiality as individuals subject to chapter 51 proceedings. *See, e.g.,* Wis. Stat. §§ 51.20(5), 51.20(12) (right to request closed hearings); Wis. Stat. §§ 51.30, 51.61.(1)(n) (closed court and treatment records); § 51.61(1)(o) (right not to be filmed or taped).

¶ 32. We have held that "[p]ersons committed under chapters 51 and 980 are similarly situated for purposes of equal protection." *Curiel,* 227 Wis. 2d at 413 (citing *Post,* 197 Wis. 2d at 318–19). In order to attack a statute on equal protection grounds, a party must demonstrate that the "state unconstitutionally treats members of similarly situated classes differently." *Post,* 197 Wis. 2d at 318. However, "[e]qual protection is not

---

[4] Equal protection is guaranteed under Article I, Section 1 of the Wisconsin Constitution, which provides: "All people are born equally free and independent, and have certain inherent rights; among these are life, liberty and the pursuit of happiness; to secure these rights, governments are instituted, deriving their just powers from the consent of the governed."

violated where there exist reasonable and practical grounds for the classifications created by the legislature." *Curiel,* 227 Wis. 2d at 413 (citing *State v. Hezzie R.,* 219 Wis. 2d 849, 894, 580 N.W.2d 660 (1998)). Thus, "[w]hether a legislative distinction between otherwise similarly situated persons violates equal protection depends upon whether there is a reasonable basis to support it." *State v. Dennis H.,* 2002 WI 104, ¶ 31, 255 Wis. 2d 359, 647 N.W.2d 851 (citing *State ex rel. Jones v. Gerhardstein,* 141 Wis. 2d 710, 733, 416 N.W.2d 883 (1987)). "Where the classification does not involve a suspect class [or a fundamental interest], equal protection is denied only if the legislature has made an irrational or arbitrary classification." *Jones,* 141 Wis. 2d at 733.

¶ 33. Although persons committed under chapter 980 are similarly situated to those committed under chapter 51, there is a rational basis for the legislature's distinction with respect to the confidentiality of proceedings under the two chapters. In *Post,* we noted that "[d]ifferences in difficulty of diagnosis, degree of dangerousness, and intrusiveness of treatment [have been] found by the [U.S.] Supreme Court to be sufficient justifications for differential treatment . . . ." *Post,* 197 Wis. 2d at 322. In evaluating and comparing the legislative schemes of chapters 51 and 980, we have held that:

> The legislature has determined that, as a class, persons predisposed to sexual violence are more likely to pose a higher level of danger to the community than do other classes of mentally ill or mentally disabled persons. This heightened level of dangerousness and the unique treatment needs of sexually violent persons justify

> distinct legislative approaches to further the compelling governmental purpose of protection of the public.

*Id.* at 322–23. Accordingly, we conclude that Burgess's right to equal protection was not violated due to differences in confidentiality between chapter 980 proceedings and proceedings under chapter 51.

¶ 34. In sum, we conclude that the circuit court had jurisdiction to conduct proceedings under chapter 980 for the involuntary civil commitment of Burgess because the conduct at the heart of chapter 980, both past and potential future conduct, is prohibited and not merely regulated; therefore, the State has jurisdiction under PL-280. We also conclude that there was sufficient evidence for the jury to find that Burgess is a "sexually violent person" for purposes of commitment under chapter 980. Finally, we conclude that Burgess was not denied equal protection of the law because there is a rational basis for the legislature to treat the confidentiality of chapter 980 proceedings differently than chapter 51 proceedings.

*By the Court.*—The decision of the court of appeals is affirmed.