# In the
# United States Court of Appeals
## For the Seventh Circuit

---

No. 05-1663

STEVEN J. BURGESS,

*Petitioner-Appellant,*

*v.*

STEVEN WATTERS,

*Respondent-Appellee.*

---

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 04-C-544—**Barbara B. Crabb**, *Chief Judge.*

---

ARGUED SEPTEMBER 19, 2005—DECIDED NOVEMBER 2, 2006

---

Before RIPPLE, WOOD, and WILLIAMS, *Circuit Judges.*

WOOD, *Circuit Judge.* Steven J. Burgess was involuntarily committed to a Wisconsin state mental health facility after a jury found that he was a sexually violent person as defined in Wisconsin's Sexually Violent Person Commitment Statutes, Wis. Stat. § 980 *et seq.* (chapter 980). Both the Wisconsin Court of Appeals and the Supreme Court of Wisconsin affirmed the judgment ordering his commitment. After exhausting his state court remedies, he filed a petition for a writ of habeas corpus in the United States District Court for the Western District of Wisconsin, and the district court denied relief. Burgess now appeals to this court.

What distinguishes this case from the many habeas corpus petitions this court entertains each term is that it involves one additional sovereign—Burgess is a member of a federally recognized Indian tribe. He argues that as a legal resident of an Indian reservation, the State of Wisconsin lacked jurisdiction to commit him involuntarily as a sexually violent person. He relies on Public Law 280, 67 Stat. 588 (1953), codified in part at 18 U.S.C. § 1162, 28 U.S.C. § 1360, under which Congress expressly granted Wisconsin criminal and limited civil jurisdiction over matters involving Indians. We conclude that the Supreme Court of Wisconsin's ultimate resolution of Burgess's jurisdictional claim was not contrary to or an unreasonable application of clearly established law as articulated by the Supreme Court of the United States, and we thus affirm the district court's denial of the petition.

# I

Burgess is an enrolled member of the Lac du Flambeau Band of Lake Superior Chippewa Indians (Lac du Flambeau), a federally-recognized Indian tribe. For most of his life, Burgess has lived on the Lac du Flambeau Reservation in Vilas County, Wisconsin; he is a legal resident of his tribal reservation land.

In February of 1995, Burgess was convicted of attempted second-degree sexual assault of a child (a crime that he committed on his reservation) in the Circuit Court for Vilas County, Wisconsin. He was subsequently incarcerated at the Oshkosh Correctional Institution, a prison facility of the State of Wisconsin. There is no question that the Wisconsin Circuit Court had jurisdiction, conferred by § 2 of Public Law 280, to try Burgess for this crime. See *State v. Webster*, 338 N.W.2d 474, 476 (Wis. 1983) ("Public Law 280 gave certain states, including Wisconsin, jurisdiction over crimes committed by or against Indians in Indian country within

each state."); see also 18 U.S.C. § 1162(a) ("[T]he criminal laws of such state or territory shall have the same force and effect within such Indian country as they have elsewhere within the State or Territory.").

On November 17, 1998, the day that Burgess was scheduled to be released from prison, the State of Wisconsin filed a petition seeking his commitment as a chapter 980 "sexually violent person." At that time, chapter 980 defined "sexually violent person" as:

> a person who has been convicted of a sexually violent offense, or has been found not guilty of or not responsible for a sexually violent offense by reason of insanity or mental disease, defect, or illness, and who is dangerous because he or she suffers a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence.

Wis. Stat. § 980.01(7) (amended 2006). (The statute has recently been amended; the last clause now reads "that the person will engage in *one or more* acts of sexual violence." Wis. Stat. § 980.01(7) (2006) (emphasis added).) Once a court or jury has determined after proper proceedings that the individual is a sexually violent person, "the court shall order the person to be committed to the custody of the [D]epartment [of Health and Family Services] for control, care and treatment until . . . the person is no longer a sexually violent person." Wis. Stat. § 980.06.

The statute also spells out the requirements for the commitment procedures. The process begins with a probable cause hearing, to determine whether "there is probable cause to believe that the person named in the petition is a sexually violent person." *Id.* § 980.04(2). At the time the state filed its chapter 980 petition in Burgess's case, the statute provided that "[i]f the court determines after a hearing that there is probable cause to believe that the person named in the petition is a sexually violent person,

the court shall order that the person be taken into custody if he or she is not in custody and shall order the person to be transferred within a reasonable time to an appropriate facility for an evaluation as to whether the person is a sexually violent person." *Id.* § 980.04(3) (amended 2006). On November 19, 1998, the circuit court found probable cause that Burgess was a sexually violent person and ordered him transferred to a state mental health institution for evaluation.

Burgess requested a jury for the commitment proceeding. See *id.* § 980.05(2). At the hearing, the state bore the burden of proving beyond a reasonable doubt that he is a sexually violent person. *Id.* § 980.05(3)(a). At the time Burgess's petition was pending before the circuit court, the statute also afforded him "all constitutional rights available to a defendant in a criminal proceeding," *id.* § 980.05(1m). That provision has since been repealed, but we have no occasion to consider any implications of the change, as it has no effect on Burgess.

Prior to his hearing, Burgess filed a host of motions. Most relevant to this appeal, he moved to dismiss the state's petition on the ground that the circuit court lacked jurisdiction to conduct involuntary civil commitment proceedings against enrolled tribal members. His position, essentially, was that a chapter 980 proceeding falls into the cracks between the jurisdiction conferred by the criminal and civil provisions of Public Law 280. He acknowledged that the federal statute grants Wisconsin broad criminal jurisdiction over offenses committed by Indians both within the state and on their reservation land, but he argued that this was not a criminal proceeding. The grant of civil jurisdiction in § 4 of Public Law 280, codified at 28 U.S.C. § 1360(a), is limited to private, civil litigation involving tribal members in state court and does not give the state general civil regulatory authority over reservation Indians; Burgess's position was that the involuntary commitment process

more resembled a regulatory action than a suit in tort or contract.

After receiving Burgess's motion, the circuit court wrote a letter to the Lac du Flambeau tribal court asking whether it could handle Burgess's commitment proceeding. That court declined jurisdiction, indicating that it was not in a position to hear Burgess's case because the tribe at that time had no laws or ordinances calling for the indefinite commitment of sexually violent persons. As a result, the circuit court denied Burgess's motion based on its understanding that the state was allowed to assert jurisdiction over reservation Indians in any area where the tribe did not have an ongoing tradition of acting.

At the hearing, both sides presented expert testimony about Burgess's mental condition and the likelihood of recidivism. The jury found Burgess to be a sexually violent person. On August 10, 2000, the circuit court entered a judgment indefinitely committing Burgess to the Wisconsin Department of Heath and Family Services. Burgess filed a number of post-judgment motions, including a motion for a new trial or relief from judgment based in part on his jurisdictional objection, but the circuit court denied these motions.

Burgess appealed. Among the issues he raised before the Wisconsin Court of Appeals was his argument that the state court lacked jurisdiction to conduct chapter 980 proceedings against enrolled tribal members, particularly where the underlying offense was committed on reservation land. The court of appeals affirmed. It agreed with Burgess that chapter 980 was not a criminal or punitive law, and therefore that the circuit court did not have criminal jurisdiction over Burgess's case. *In re the Commitment of Steven J. Burgess*, 654 N.W.2d 81, 88 (Wis. Ct. App. 2002) (citing *State v. Carpenter*, 541 N.W.2d 105, 112-13 (1995)). Nevertheless, it rejected Burgess's argument that this proceeding

fell outside the scope of Public Law 280's grant of civil jurisdiction.

Burgess then turned to the state supreme court, which affirmed the judgment of the court of appeals on different grounds. The supreme court reasoned that the circuit court had jurisdiction to conduct Burgess's chapter 980 proceedings under Public Law 280's broad grant of criminal jurisdiction because the underlying conduct at issue, sexually violent behavior, was prohibited by state criminal law. The supreme court also concluded that Burgess's commitment proceeding was somehow ancillary to the circuit court's general criminal jurisdiction over tribal members because the "civil proceedings under chapter 980 are enveloped on both sides by criminal conduct." *In re the Commitment of Steven J. Burgess*, 665 N.W.2d 124, 132 (Wis. 2003). In this connection, it pointed out that "only persons who have committed sexually violent offenses are eligible for commitment under chapter 980" and "chapter 980 commitments are intended to protect the public by preventing future acts of sexual violence." *Id*. In the alternative, the supreme court decided that "even if chapter 980 is strictly construed as a 'civil' law in its entirety," it is not the type of civil law that gives the state general regulatory authority over tribal members. Instead, as a more ordinary civil law, it falls within Public Law 280's grant of civil jurisdiction. *Id*. In September 2003, the court denied Burgess's motion for reconsideration; the United States Supreme Court denied *certiorari* on March 29, 2004.

Burgess then filed this petition for a writ of habeas corpus. See 28 U.S.C. § 2254. The district court adopted a magistrate judge's recommendation to deny Burgess's petition on February 14, 2005. Although the district court believed that Burgess had presented a strong argument that the Supreme Court of Wisconsin erred in determining that the state had jurisdiction to commit him under chapter

980, it held that the state court's ruling was nonetheless not contrary to or an unreasonable application of clearly established precedent from the Supreme Court of the United States. The district court further opined that in cases such as this, where reasonable jurists can debate whether a particular state court ruling is contrary to federal law, it is up to the United States Supreme Court to make the final call. Recognizing the substantiality of the jurisdictional issue, the court granted Burgess's motion for a certificate of appealability on March 10, 2005.

## II

On appeal, Burgess makes a number of powerful arguments concerning general principles of tribal sovereignty and the extent of Congress's grant of jurisdiction to the states over the affairs of reservation Indians. As interesting as the merits of Burgess's jurisdictional arguments are, because he filed his petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254, its standard of review governs this case. See *Gomez v. Berge*, 434 F.3d 940, 942 (7th Cir. 2006). Under AEDPA, habeas corpus relief is available only if Burgess can establish that the state court proceedings "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). We review the decision of the last state court to rule on the merits of the petitioner's claim, here the Wisconsin Supreme Court. See *McFowler v. Jaimet*, 349 F.3d 436, 446 (7th Cir. 2003).

Under AEDPA, a state court's decision is "contrary to" clearly established federal law "when the court reache[s] a conclusion 'opposite to that reached by [the Supreme] Court

on a question of law' or confront[s] 'facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from [its] precedent.'" *Laxton v. Bartow*, 421 F.3d 565, 570 (7th Cir. 2005) (quoting *Williams v. Taylor,* 529 U.S. 362, 405-06 (2000)). A state court "unreasonably applies" clearly established Supreme Court decisions when it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular [petitioner's] case." *Id.* (quoting *Williams*, 529 U.S. at 407-08) (internal quotation marks omitted). In determining whether a state court has fallen afoul of the "unreasonable application" branch of AEDPA, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411. The federal court may act only if the state court's decision is "objectively unreasonable." *Id.* at 409. This court has defined "objectively unreasonable" as "lying well outside the boundaries of permissible differences of opinion," *Hardaway v. Young*, 302 F.3d 757, 762 (7th Cir. 2002); we will allow the state court's decision to stand if it is "one of several equally plausible outcomes." *Hall v. Washington*, 106 F.3d 742, 749 (7th Cir. 1997).

   Within AEDPA's framework, we review the district court's decision to deny Burgess's habeas petition *de novo*. See *Horton v. Litscher*, 427 F.3d 498, 504 (7th Cir. 2005). Whether the state court's decision was contrary to or an unreasonable application of clearly established federal law "is a mixed question of law and fact that we traditionally also review *de novo* but with a grant of deference to any *reasonable* state court decision." *Jackson v. Frank*, 348 F.3d 658, 662 (7th Cir. 2003) (quoting *Schaff v. Snyder,* 190 F.3d 513, 522 (7th Cir. 1999) (emphasis in original)). In this case, as in all cases that come to us under AEDPA, we emphasize that we are expressing no opinion about the correctness of

the state court's ruling as a matter of first principles. Should a case in this area reach us through a different procedural avenue without the AEDPA constraints on review, we would be free to evaluate it for ourselves.

## III

As a general matter, Indian tribes "retain attributes of sovereignty over both their members and their territory"; "tribal sovereignty is dependent on, and subordinate to, only the Federal government, not the States." *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 207 (1987) (internal citations omitted). Although a state is not completely barred from exercising jurisdiction over the activities of tribal members on reservation land lying within its boundaries, "the exercise of state jurisdiction is limited and must be based upon a specific grant of authority by Congress." *St. Germaine v. Circuit Court for Vilas County*, 938 F.2d 75, 76 (7th Cir. 1991). One such delegation of authority is found in Public Law 280, which grants six states, including Wisconsin, "jurisdiction over specified areas of Indian country." *Cabazon*, 480 U.S. at 207. In enacting Public Law 280, Congress was primarily concerned with "the problem of lawlessness on certain Indian reservations," as well as the "absence of adequate tribal institutions for law enforcement." *Bryan v. Itasca County, Minn.*, 426 U.S. 373, 379 (1976). With this in mind, the "central focus" of the Act, *id.* at 380, was to give the enumerated states "broad criminal jurisdiction over offenses committed by or against Indians within all Indian country within the State." *Cabazon*, 480 U.S. at 207. Section 2 of the Act therefore grants "jurisdiction over offenses committed by or against Indians in the areas of Indian country . . . to the same extent that such State or Territory has jurisdiction over offenses committed elsewhere within the State or Territory, and the criminal laws of such State or Territory shall have the same force

and effect within such Indian country as they have else-where within the State or Territory." 18 U.S.C. § 1162(a).

Section 4 of Public Law 280 addresses civil cases, confer-ring upon the listed states "jurisdiction over civil causes of action between Indians or to which Indians are parties . . . to the same extent that such State has jurisdiction over other civil causes of action, and those civil laws of such State that are of general application to private persons or private property shall have the same force and effect within Indian country as they have elsewhere within the State." 28 U.S.C. § 1360(a). The Act's grant of civil jurisdiction, however, is more restricted than its grant of criminal jurisdiction. *Cabazon*, 480 U.S. at 207. The Supreme Court has read the statute as one that is "primarily intended to redress the lack of adequate Indian forums for resolving private legal disputes between reservation Indians, and between Indians and other private citizens, by permitting the court of the States to decide such disputes." *Bryan,* 426 U.S. at 383. In *Bryan*, the Court wrote that "the consistent and exclusive use of the terms 'civil causes of action,' 'aris(ing) on,' 'civil laws . . . of general application to private persons or private property,' and 'adjudica(tion),' in both the Act and its legislative history virtually compel[led] [the] conclusion that the primary intent of § 4 was to grant jurisdiction over private civil litigation involving reserva-tion Indians in state court," and, importantly for Burgess's argument, *not* to confer general state civil regulatory control over Indian reservations. *Id.* at 384-85.

The Supreme Court has also emphasized that Public Law 280 "plainly was not intended to effect total assimilation of Indian tribes into mainstream American society," recogniz-ing that "a grant to States of general civil regulatory power over Indian reservations would result in the destruction of tribal institutions and values." *Cabazon*, 480 U.S. at 208. Thus, the proper characterization of a state law as criminal

or civil is an important first step in determining whether it can be applied on a reservation. *Id.* In *Cabazon,* which was about the applicability of a general California bingo statute on reservations, the Court held that the critical distinction is between state "criminal/ prohibitory" laws and state "civil/regulatory" laws. *Id.* at 209-10. If a state law is designed generally to prohibit certain conduct, it should be classified as criminal; if it "generally permits the conduct at issue, subject to regulation, it must be classified as civil/regulatory and Pub. L. 280 does not authorize its enforcement on an Indian reservation. The shorthand test is whether the conduct at issue violates the State's public policy." *Id.* at 209. The Court concluded that the bingo statute was regulatory and thus could not be enforced on the reservation. *Id.* at 221-22.

**IV**

Although the Supreme Court of Wisconsin correctly identified *Bryan* and *Cabazon* as the governing Supreme Court precedents, more than a correct citation is needed to avoid a decision "contrary to" clearly established federal law. As we noted earlier, a state court decision is "contrary to" a decision of the Supreme Court of the United States if, on materially indistinguishable facts, it comes out the opposite way. AEDPA in effect draws a line between decisions that are flatly inconsistent with earlier precedents of the Supreme Court, and decisions that, while not inconsistent in this literal sense, unreasonably apply the Court's decisions. In the present case, it makes little difference in the end whether we analyze the state court's decision under the "contrary to" part of AEDPA or under the "unreasonable application" part. One way or the other, the question at the end of the day is whether a writ of habeas corpus may issue. We therefore discuss the Supreme Court of Wisconsin's application of federal precedents with both parts of AEDPA in mind.

The first task is to see whether chapter 980 of the Wisconsin statutes should be classified as criminal or civil. The Wisconsin court held that chapter 980 is more criminal than civil for purposes of Public Law 280 because the underlying conduct addressed by chapter 980, sexually violent behavior, is contrary to Wisconsin's public policy; it is not conduct that the state generally permits subject to regulation. The state supreme court further reasoned that chapter 980 is more accurately characterized as criminal because "only individuals who have been convicted of certain crimes—'sexually violent offenses,' may be committed pursuant to chapter 980" and "the primary purpose of chapter 980 is to protect the public from future acts of sexual violence." *In re Burgess*, 665 N.W.2d at 132.

Rather than confronting this rationale directly, Burgess devotes the bulk of his opening brief in this court to a discussion of the decisions of the Supreme Court of Wisconsin in *County of Vilas v. Chapman*, 361 N.W.2d 699 (Wis. 1985) and *State v. Webster*, 338 N.W.2d 474 (Wis. 1983). Errors in these decisions, he believes, tainted the court's ruling in his case. According to Burgess, the Supreme Court of Wisconsin has taken the view that the state is free to assert jurisdiction over reservation Indians in any area where the tribe does not have an ongoing tradition of acting. This proposition, he argues, conflicts with Supreme Court precedent providing that Congress must expressly grant the state jurisdiction over the activity in question.

The problem with Burgess's argument is that it does not address the basis on which the state court ultimately ruled. Rather than relying on *Chapman* or *Webster*, the state supreme court held that Congress, through Public Law 280, explicitly granted the state jurisdiction over Burgess's commitment proceeding. Under the circumstances, neither *Chapman* nor *Webster* is before us, and we have no occasion to decide whether one or the other runs afoul of applicable Supreme Court precedent. Because the Supreme Court of

Wisconsin relied on *Cabazon,* it is with that decision that we begin our analysis.

*Cabazon* is more helpful for distinguishing between civil and criminal cases for purposes of Public Law 280 than it is for drawing the line between civil cases that the state may entertain and those it may not. The characterization of a state law as "criminal" or "civil" for purposes of the federal jurisdictional statute is a question of federal law: the question is which state proceedings, however labeled, did Congress mean to permit the states to conduct with respect to their Native American populations. *Cf. Taylor v. United States,* 495 U.S. 575, 590-91, 598 (1990) (adopting uniform federal definition of term "burglary" for purposes of 18 U.S.C. § 924(e)). The state court's choice of label cannot be the last word on the matter. Ultimately, it is federal law, as authoritatively interpreted by the Supreme Court of the United States, that provides the answer we seek.

With respect, we cannot agree with the Supreme Court of Wisconsin that chapter 980 qualifies as a "criminal" statute. If it is, indeed, a criminal statute, serious consequences would follow in other areas of the law. A person like Burgess who already has been convicted and punished for certain behavior would be able to plead double jeopardy, for example. Criminal procedure rules of constitutional dimension would have to be respected during the proceeding. But the Supreme Court of the United States has squarely rejected this characterization for a law materially identical to Wisconsin's, in *Kansas v. Hendricks,* 521 U.S. 346 (1997). In *Hendricks,* the Court held that a Kansas statute that permitted confinement of a person who was likely to engage in "predatory acts of sexual violence" violated neither the Double Jeopardy Clause of the Constitution nor the *ex post facto* clause. *Id.* at 361. It was "unpersuaded . . . that Kansas has established criminal proceedings." *Id.*

Other decisions, including some from Wisconsin itself, have also rejected the argument that statutes like chapter

980 create criminal offenses. See, *e.g.*, *Seling v. Young*, 531 U.S. 250 (2001) (recognizing that Washington State's Community Protection Act of 1990, which is virtually indistinguishable from Wisconsin's chapter 980 statute, was civil as opposed to criminal and rejecting contention that a habeas petitioner could mount a challenge that the Act was "criminal as applied"); *Allen v. Illinois*, 478 U.S. 364 (1986) (holding that proceedings under the Illinois Sexually Dangerous Persons Act were not criminal for purposes of Fifth Amendment's prohibition of compulsory self-incrimination); *State v. Carpenter*, 541 N.W.2d 105, 107 (Wis. 1995) ("We conclude in this opinion that ch. 980 creates a civil commitment procedure primarily intended to protect the public and to provide concentrated treatment to convicted sexually violent persons, not to punish the sexual offender."); *Jay M.H. v. Winnebago County Dept. of Health and Human Servs.*, 714 N.W.2d 241, 244 n.4 (Wis. App. 2006) ("Wisconsin Stat. ch. 980 creates a civil commitment procedure primarily intended to provide treatment and protect the public, is not criminal in nature, and is not intended to punish the offender."). In Burgess's case itself, the state supreme court acknowledged its previous holding that the chapter 980 statute was "civil rather than criminal," *In re Burgess*, 665 N.W.2d at 132, but it nonetheless determined that the state had jurisdiction to commit Burgess under Public Law 280's grant of criminal jurisdiction. But the court gave no reason why this state statute should suddenly become criminal solely for the purpose of jurisdiction over crimes committed by Indians, when it has authoritatively been deemed civil in all other contexts.

The state court noted that chapter 980 is actually aimed at prohibiting "conduct" that violates Wisconsin's public policy. That alone, however, cannot be enough; exactly the same thing could have been said about the Kansas statute at issue in *Hendricks*. Without question, the past commission of a sexual assault is "conduct" that offends

state public policy and for which there are criminal penalties. See Wis. St. §§ 940.225, 948.02. Chapter 980, however, has been described by the Supreme Court of Wisconsin as a future-oriented statute that is "primarily intended to protect the public and to provide concentrated treatment to convicted sexually violent persons." *Carpenter*, 541 N.W.2d at 107. Like the involuntary commitment statute at issue in *Hendricks,* chapter 980 does not "make the commission of a specified 'offense' the basis for invoking the commitment proceedings. Instead, it uses a prior conviction (or previously charged conduct) for evidentiary purposes to determine whether a person suffers from a mental abnormality . . . and also poses a threat to the public." 521 U.S. at 370.

We are also unpersuaded by the proposition that a law like chapter 980 should be regarded as criminal for purposes of Public Law 280 because, as the Wisconsin Supreme Court put it, it is "enveloped on both sides" by criminal conduct. *In re Burgess*, 665 N.W.2d at 132. In fact, that is not necessarily the case. Although chapter 980 certainly applies to persons like Burgess who have been convicted of sexually violent offenses, it also applies to individuals who "ha[ve] been found not guilty of or not responsible for a sexually violent offense by reason of insanity or mental disease, defect, or illness." Wis. St. § 980.01(7) (amended 2006). On the back end, the Wisconsin Supreme Court found support for a "criminal" classification in the fact that chapter 980 is intended to protect the public by preventing future acts of sexually violent behavior. This is inconsistent, however, with decisions of the Supreme Court of the United States that have characterized these and similar schemes as civil precisely because they are aimed at protecting the public from future danger. See, *e.g.*, *Hendricks*, 521 U.S. at 361 ("Nothing on the face of the statute suggests that the legislature sought to create anything other than a civil commitment scheme designed to protect the public from harm."); *Smith v. Doe*, 538 U.S. 84, 108 (2003) (holding that

sex offender registration statute is civil and nonpunitive and recognizing that "[e]nsuring public safety is. . .a fundamental regulatory goal"); *Jones v. United States*, 463 U.S. 354, 361-62(1983) (recognizing that the "statutory scheme for commitment of insane criminals is . . . a regulatory, prophylactic statute, based on a legitimate governmental interest in protecting society and rehabilitating mental patients" (internal quotation marks omitted)).

In the final analysis, if this case turned solely on the question whether clearly established federal law would permit a characterization of chapter 980 as criminal, we would need to reverse. It does not, however. Public Law 280 also permits the designated states to exercise certain forms of civil jurisdiction over Indians. The Supreme Court of Wisconsin squarely addressed this alternate ground and held that "even if chapter 980 is strictly construed as a 'civil' law in its entirety, it is civil/adjudicatory rather than civil/regulatory, and therefore falls within PL-280's grant of civil jurisdiction to the State." *In re Burgess*, 665 N.W.2d at 132. We therefore turn now to that rationale.

**V**

In upholding the state's power to treat Burgess's case under the civil jurisdiction permitted by federal law, the state supreme court relied on the Supreme Court's decision in *Bryan*. In that case, the Court considered whether § 4 of Public Law 280 gave states the power to tax reservation Indians under specified conditions. In concluding that the state lacked this power, the Court reasoned that § 4 was primarily intended "to redress the lack of adequate Indian forums for resolving private legal disputes between reservation Indians, and between Indians and other private citizens," not to "confer general state civil regulatory authority over reservation Indians." *Bryan*, 426 U.S. at 383, 384. In a footnote, the Court cited a law review

article for the proposition that "Congress intended 'civil laws' to mean those laws which have to do with private rights and status. Therefore, 'civil laws . . . of general application to private persons or private property' would include the laws of contract, tort, marriage, divorce, insanity, descent, etc., but would not include laws declaring or implementing the states' sovereign powers, such as the power to tax, grant franchises, etc." *Id.* at 385 n. 10. Based upon this language, the Wisconsin Supreme Court determined that chapter 980 is a law having to do with private rights and status, more akin to a proceeding to adjudicate insanity than to a law conferring upon the state the power to tax.

Although it is clear that a state does not have the power to tax reservations under Public Law 280's limited grant of civil jurisdiction, the Supreme Court has not had much to say about how to determine whether a law seeks to adjudicate private rights, and thus falls within the bounds of § 4 of Public Law 280, or is a regulatory scheme. This court has questioned whether a state would have jurisdiction involuntarily to commit an enrolled tribal member, but we did not need to decide the issue. See *United States v. Teller*, 762 F.2d 569, 577 (7th Cir. 1985) (noting that "questions of jurisdiction are raised by two facts—the crime took place on an Indian reservation, and so trial was to be in federal court, and the defendant is an Indian, and so perhaps not subject to the state's civil commitment procedures."). There are certainly strong arguments that chapter 980 falls outside Public Law 280's limited grant of civil jurisdiction. In other contexts, the Supreme Court has expressly classified these types of civil laws that aim to protect the public from danger as "regulatory." See, *e.g.*, *Smith v. Doe*, 538 U.S. 84, 108 (2003); *Jones v. United States*, 463 U.S. 354, 361-62 (1983); *Addington v. Texas*, 441 U.S. 418, 426 (1979) ("[T]he state also has authority under its police power to protect the community from the danger-

ous tendencies of some who are mentally ill."). At least one court has determined that a state lacks the authority involuntarily to commit a mentally ill Native American who resides on a reservation. *White v. Califano*, 437 F.Supp. 543, 550 (D.S.D. 1977), *aff'd.*, 581 F.2d 697 (8th Cir. 1978) (determining that because "the process of committing someone involuntarily brings the power of the state deep into the lives of the persons involved in the commitment process . . . applying the procedures of an involuntary commitment to an Indian person in Indian country would require severe intrusions into the tribe's vestigial sovereignty"). The Wisconsin Attorney General has opined that Public Law 280 applies only to disputes between private parties, which would seem to exclude a proceeding like the one Burgess faced. See 70 Wis. Op. Atty. Gen 237 at *3 (1981).

In *United States v. Teller*, we recognized that the question whether a reservation Indian could be subject to involuntary civil commitment was "an open question of some difficulty." 762 F.2d at 577 n.5. Relying on the language in *Bryan* suggesting that proceedings to adjudicate status, such as insanity, probably fall within Public Law 280's grant of civil jurisdiction, the Supreme Court of Wisconsin resolved this question in favor of the state's jurisdiction. The Supreme Court of the United States has not spoken to this precise question. Burgess interprets *Bryan*'s reference to "status" and "insanity" as referring to private disputes concerning insanity, such as a case concerning guardianship, and not those cases to which the state is a party. This interpretation is certainly reasonable; in fact, the Wisconsin Attorney General may well agree with Burgess in this matter. See 70 Wis. Op. Atty. Gen 237 at *3 (in the context of child custody matters involving Indians, opining that the state would not have jurisdiction involuntarily to terminate parental rights, but "where the proceeding is not between the state and

individual, but rather primarily involves only private persons as in a voluntary foster care placement, state law may be applied under Public L. No. 280's jurisdictional grant.").

Burgess's view, however, is not the only reasonable interpretation. Indeed, at least one other court has rejected the argument that civil actions to which the state is a party automatically fall outside Public Law 280's limited grant of civil authority. See *Doe v. Mann*, 415 F.3d 1038 (9th Cir. 2005) (specifically rejecting the Wisconsin Attorney General's opinion distinguishing between voluntary and involuntary child custody matters and determining that California's enforcement of its child dependency laws fell within state's civil adjudicatory jurisdiction and thus state could terminate reservation Indian's parental rights). This is enough to show, under the generous AEDPA standards, that the Wisconsin Supreme Court's conclusion does not lie outside the bounds of permissible differences of opinion. We thus cannot conclude that the court unreasonably applied clearly established federal law.

**VI**

The Wisconsin Supreme Court's determination that Public Law 280 conferred jurisdiction on the State of Wisconsin to commit Burgess under applicable state law was not contrary to or an unreasonable application of clearly established federal law. We therefore AFFIRM the district court's judgment denying Burgess's petition for a writ of habeas corpus.

RIPPLE, *Circuit Judge*, concurring in the judgment. In my view, the Supreme Court of Wisconsin reached a reasonable result when it determined that, for purposes of section 2 of Public Law 280, 67 Stat. 588 (1953), the commitment procedure under the Wisconsin Sexually Violent Persons Commitment Statutes, Wis. Stat. § 980 et seq. (chapter 980), is criminal in nature.

A true Copy:

      Teste:

                            _____
                            *Clerk of the United States Court of*
                                *Appeals for the Seventh Circuit*