In the Matter of the Civil Commitment of Jeremiah Jerome JOHNSON,

and

In the Matter of the Civil Commitment of Lloyd Robert Desjarlais.

Nos. A09–2225, A09–2226.

Supreme Court of Minnesota.

July 20, 2011.

---

Victor H. Smith, Smith Law Office, Walker, MN, for appellants Jeremiah Jerome Johnson and Lloyd Robert Desjarlais.

Christopher J. Strandlie, Cass County Attorney, Walker, MN; and Noah A. Cashman, Assistant Attorney General, St. Paul, MN, for respondent Cass County.

## OPINION

GILDEA, Chief Justice.

The question in this case is whether Minnesota's civil commitment statute, Minn.Stat. ch. 253B (2010), can be enforced to commit appellants, who are enrolled tribal members, as sexually dangerous persons. Because we conclude that Minnesota has jurisdiction to commit appellants, we affirm.

*Appellant Johnson*

Appellant Jeremiah Jerome Johnson is an enrolled member of the Bois Forte Band of the Minnesota Chippewa Tribe. In 2008, respondent Cass County sought to commit Johnson under the Minnesota Commitment and Treatment Act, Minn. Stat. ch. 253B. Johnson was incarcerated at the time the County sought his commitment. Prior to his incarceration, the record reflects that Johnson did not live on the Bois Forte reservation, but resided on the Leech Lake reservation.

At his commitment hearing, Johnson stipulated to classification as a "sexually dangerous person" under Minn.Stat. § 253B.02, subd. 18c. The district court also made extensive findings to support Johnson's commitment as a sexually dangerous person. The court's findings concerning Johnson's history of harmful sexual conduct are the most relevant to our decision. *See* Minn.Stat. § 253B.02, subd. 18c (defining a "sexually dangerous person" as a person who, among other things, "has engaged in a course of harmful sexual conduct" as defined by Minn.Stat. § 253B.02, subd. 18c(a)); *see also* Minn. Stat. § 253B.02, subd. 7a (defining "harmful sexual conduct" and establishing a rebuttable presumption that certain criminal conduct constitutes "harmful sexual conduct"). The court found that in 2003, when Johnson was 17 years old, Johnson sexually assaulted a 15–year–old female in Kego Lake Township in Cass County. Johnson pleaded guilty to a false imprisonment charge for that incident. *See* Minn. Stat. § 253B.02, subd. 7a(b) (establishing a rebuttable presumption that false imprisonment under Minn.Stat. § 609.255 (2010) creates a substantial likelihood that the victim suffered serious physical or emotional harm). The court also found that in 2005, Johnson forced another 15–year–old victim to have sexual intercourse in Bena,

Minnesota. Johnson pleaded guilty to fourth-degree criminal sexual conduct for that incident. *See id.* (establishing a rebuttable presumption that fourth-degree criminal sexual conduct under Minn.Stat. § 609.345 (2010) creates a substantial likelihood that the victim suffered serious physical or emotional harm). The sentencing court stayed execution of Johnson's sentence for this offense, but Johnson violated the terms of his probation. Johnson's probation was revoked, and in 2006, his 33–month prison sentence was executed. Johnson was serving his sentence at the Minnesota Correctional Facility at Rush City when the County sought his commitment.

The district court concluded that Johnson satisfied the requirements for commitment as a sexually dangerous person and committed Johnson to the Minnesota Sex Offender Program in St. Peter and Moose Lake, Minnesota, in 2009. In August 2009, the court made Johnson's commitment indeterminate. *See* Minn.Stat. § 253B.18, subd. 3.

The district court did not make any factual findings as to whether the conduct underlying the court's conclusion that Johnson was a sexually dangerous person occurred on or off an Indian reservation. But the parties agreed at oral argument before our court that some of the conduct occurred on reservation and some of it occurred off reservation. To the extent the conduct occurred on a reservation, such conduct occurred on the Leech Lake reservation.

### Appellant Desjarlais

Appellant Lloyd Robert Desjarlais is an enrolled member of the Leech Lake Band of the Minnesota Chippewa Tribe. In 2008, Cass County sought to commit Des-

jarlais as a sexual psychopathic personality and a sexually dangerous person. Desjarlais was in custody at the time the County sought his commitment.[1] When he was not in custody, the record reflects that Desjarlais lived on the Leech Lake reservation.

At his commitment hearing, Desjarlais stipulated to commitment as a sexually dangerous person under Minn.Stat. § 253B.02, subd. 18c. The district court also made extensive findings to support Desjarlais' commitment as a sexually dangerous person. As with Johnson, most relevant to our decision are the court's findings detailing Desjarlais' history of harmful sexual conduct. The court found that in 2002, when he was 14 years old, Desjarlais engaged in both consensual and forced sexual conduct while at the Northwest Minnesota Juvenile Center Satellite Home in Bemidji. Desjarlais was charged by juvenile delinquency petition with third-degree criminal sexual conduct for those acts, but the State dismissed the charge and Desjarlais was adjudicated delinquent for indecent exposure instead. The court nevertheless found for the purposes of civil commitment that the conduct constituted third-degree criminal sexual conduct, *see* Minn.Stat. § 609.344 (2010), which carries a presumption of harm under Minn.Stat. § 253B.02, subd. 7a(b). The court alternatively found that even without the presumption of harm under subdivision 7a(b), Desjarlais' 2002 conduct nevertheless constituted harmful sexual conduct.

The district court also found that in 2004, when he was 16 years old, Desjarlais violently forced intercourse on a 15–year-old victim on three separate occasions. The record reflects that these incidents took place in Brainerd, Minnesota. The Crow Wing County Attorney's Office de-

---

1. Desjarlais was being held at the Hubbard County Jail in Park Rapids, Minnesota, on

charges of assault and theft of a motor vehicle.

clined to prosecute Desjarlais for these acts. But the court nevertheless found that the acts occurred and constituted third-degree criminal sexual conduct, which carries a presumption of harm under Minn.Stat. § 253B.02, subd. 7a(b). The court alternatively found that even without the presumption of harm, Desjarlais' 2004 conduct constituted harmful sexual conduct.

Additionally, the district court found that in 2007, Desjarlais sexually abused a 4–year–old victim. The record indicates that the 2007 conduct occurred "in the Cass Lake area of Cass County." The State charged Desjarlais with one count of second-degree criminal sexual conduct, *see* Minn.Stat. § 609.343 (2010), which carries a presumption of harm under Minn.Stat. § 253B.02, subd. 7a(b). Desjarlais pleaded guilty to a lesser-included count of felony solicitation of a child to engage in sexual conduct under Minn.Stat. § 609.352, subd. 2 (2010). The sentencing court stayed imposition of sentence, subject to conditions, but Desjarlais violated the conditions, and the sentencing court sentenced him to 20 months in prison. The district court concluded that Desjarlais' 2007 conduct carried a statutory presumption of harm, and alternatively found that there was clear and convincing evidence that the conduct was harmful even without the statutory presumption.

The district court concluded that Desjarlais satisfied the requirements for commitment as a sexually dangerous person under Minn.Stat. § 253B.02, subd. 18c, and committed Desjarlais to the Minnesota Sex Offender Program at St. Peter and Moose Lake. In July 2009, the court made Desjarlais' commitment indeterminate. *See* Minn.Stat. § 253B.18, subd. 3.

The district court did not make any factual findings as to whether the conduct underlying the court's conclusion that Desjarlais was a sexually dangerous person occurred on or off an Indian reservation. But the parties agreed at oral argument before our court that some of the conduct occurred on the Leech Lake reservation and some occurred off reservation.

*Appeal*

Johnson and Desjarlais moved individually to dismiss their commitments for lack of subject matter jurisdiction, based on their status as enrolled tribal members. The district court denied both motions to dismiss. To support its decisions, the court concluded that "[s]exually deviant behavior is generally prohibited, and thus the civil commitment procedures in question are criminal/prohibitory" and subject to Congress' express grant of criminal jurisdiction to certain states under 18 U.S.C. § 1162 (2006). *See* Act of Aug. 15, 1953, Pub.L. 83–280, 67 Stat. 588, 588–89 (codified as amended at 18 U.S.C. § 1162, 25 U.S.C. §§ 1321–26 (2006), and 28 U.S.C. § 1360 (2006)) (Public Law 280).

Johnson and Desjarlais individually appealed the district court's orders to the court of appeals, and the court of appeals consolidated the cases. *See In re Civil Commitment of Johnson,* 782 N.W.2d 274, 277 (Minn.App.2010). Appellants asserted to the court of appeals that: (1) Congress has not granted the State jurisdiction to civilly commit appellants as sexually dangerous persons; (2) appellants' civil commitments infringe on tribal sovereignty; and (3) appellants' civil commitments violate constitutional double jeopardy protections. *Id.* at 276. The court determined that appellants' commitments did not fall under Congress' affirmative grant of jurisdiction to the State over crimes committed on Indian land. *Id.* at 280. But the court further found that although the commitments were not criminal in nature, the State's exercise of jurisdiction was "justified by strong state interests" and thus did

not interfere with Congress' interests in maintaining tribal sovereignty. *Id.* at 281. The court therefore held that even though federal law did not affirmatively grant the State jurisdiction to commit appellants, federal law did not preempt appellants' commitments. *Id.* The court of appeals also found that appellants' commitments did not violate double jeopardy protections. *Id.* at 282. Appellants filed a petition for review to this court solely on the issue of subject matter jurisdiction, which we granted.[2]

### I.

■ We turn first to the question of whether Congress has expressly consented to Minnesota's exercise of jurisdiction. This question is one that we review de novo. *State v. Davis*, 773 N.W.2d 66, 68 (Minn.2009). Federal law governs the State's "authority to exercise subject matter jurisdiction over Indians." *State v. Jones*, 729 N.W.2d 1, 4 (Minn.2007). The Supreme Court "has consistently recognized that Indian tribes retain 'attributes of sovereignty over both their members and their territory.'" *State v. Stone*, 572 N.W.2d 725, 728 (Minn.1997) (quoting *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 207, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987)). This sovereignty is "dependent on, and subordinate to, only the Federal Government, not the States." *Cabazon*, 480 U.S. at 207, 107 S.Ct. 1083 (citation omitted) (internal quotation marks omitted).

■ Under federal law, "state law does not generally apply to tribal Indians on their reservations." *State v. R.M.H.*, 617 N.W.2d 55, 58 (Minn.2000). But Indi-

ans who go "beyond reservation boundaries have generally been held subject to non-discriminatory state law otherwise applicable to all citizens of the State," absent express federal law to the contrary. *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148–49, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973). Further, state law is applicable to tribal members on tribal land if Congress has expressly consented to the state's exercise of jurisdiction, or if "the operation of federal law does not preempt it from doing so." *R.M.H.*, 617 N.W.2d at 58.[3]

The County contends that federal law expressly provides for State jurisdiction. The County cites Public Law 280 in which Congress expressly granted Minnesota and other states "jurisdiction over certain civil and criminal matters committed on Indian reservations." *State v. Davis*, 773 N.W.2d 66, 68 (Minn.2009). The State's jurisdiction over criminal matters in Public Law 280 is codified at 18 U.S.C. § 1162; the State's jurisdiction over civil matters is codified at 28 U.S.C. § 1360. The County contends that jurisdiction exists in this case under both the criminal and civil express grants of jurisdiction.

### A.

The County argues, and the district court held, that Minnesota has jurisdiction to civilly commit the appellants because the civil commitment statute is criminal in nature. But we have held in other contexts that the commitment of sexually dangerous persons and sexual psychopathic personalities is a civil, and not a criminal, matter. *See In re Linehan (Linehan IV)*, 594 N.W.2d 867, 870–72 (Minn.1999) (hold-

---

2. Neither the Leech Lake nor the Bois Forte Bands have taken a position in this case on the subject matter jurisdiction question presented here.

3. As we have noted, the parties agreed at oral argument before our court that this case involves at least some conduct by tribal members on reservation land and some conduct by tribal members off reservation land.

ing that the civil commitment statutes are civil for ex post facto and double jeopardy purposes and noting that "the SDP Act was adjudged a civil and not a criminal law" in *In re Linehan (Linehan III)*, 557 N.W.2d 171, 187–89 (Minn.1996)). We decline to revisit that analysis in this context.

## B.

█ As an alternative to its argument that the commitment statute is criminal in nature, the County argues that Minnesota has jurisdiction to commit appellants under the portion of Public Law 280 that expressly provides for state enforcement of civil laws in Indian country. The statute on which the County relies, 28 U.S.C. § 1360(a), provides that certain enumerated states, including Minnesota:

> shall have jurisdiction over civil causes of action between Indians or to which Indians are parties which arise in the areas of Indian country ... to the same extent that [Minnesota] has jurisdiction over other civil causes of action, and those civil laws of [Minnesota] that are of general application to private persons or private property shall have the same force and effect within such Indian country as they have elsewhere within the State.[4]

The County argues that appellants' commitments are "civil causes of action" that arose, in part, "in the areas of Indian country," and that appellants are parties to those "civil causes of action." Applying the terms of the statute, the County argues that Minnesota "shall have jurisdiction" over the action and the civil commitment statute, which is "of general application to private persons," has "the same force and effect" on appellants as it

does on other private persons "elsewhere within the State." *Id.*

The County's argument tracks the language of the statute. But the Supreme Court has restricted the application of section 1360(a) beyond the plain language analysis the County's argument follows. *See Bryan v. Itasca Cnty.*, 426 U.S. 373, 383, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976). The question in *Bryan* was whether Minnesota's personal property tax could be assessed against property owned by a tribal member and located on the reservation. *Id.* at 375, 96 S.Ct. 2102. The Court held that it could not. *Id.* at 393, 96 S.Ct. 2102. In reaching this conclusion, the Court examined the language and legislative history of section 1360(a) and determined that it was "primarily intended to redress the lack of adequate Indian forums for resolving private legal disputes between reservation Indians, and between Indians and other private citizens, by permitting the courts of the States to decide such disputes." *Bryan*, 426 U.S. at 383, 96 S.Ct. 2102. Accordingly, the Court determined that section 1360(a) limits the jurisdiction of the state courts to *"private* civil litigation involving reservation Indians in state court." *Bryan*, 426 U.S. at 385, 96 S.Ct. 2102 (emphasis added). The Court further determined that, by decreeing that "civil laws ... that are of general application to private persons or private property shall have the same force and effect within such Indian country as they have elsewhere within the State," *id.* at 384, 96 S.Ct. 2102 (quoting 28 U.S.C. § 1360(a)) (internal quotation marks omitted), Congress merely authorized state courts to supply "their rules of decision to decide such disputes," *id.* The Court also relied on "the absence of anything [in section 1360(a)] remotely

---

**4.** "Indian country" includes "all land within the limits of any Indian reservation under the jurisdiction of the United States Government,

... including rights-of-way running through the reservation." 18 U.S.C. § 1151 (2006).

resembling an intention to confer general state civil regulatory control over Indian reservations" in limiting the scope of section 1360(a). *Bryan*, 426 U.S. at 384, 96 S.Ct. 2102. Thus, the Court held that section 1360(a) did not grant Minnesota general civil regulatory authority over tribal Indians in Indian country and reversed Minnesota's attempt to impose a personal property tax on property belonging to a tribal Indian and located on reservation land. *Bryan*, 426 U.S. at 393, 96 S.Ct. 2102.

The Court reaffirmed *Bryan* in *Cabazon*, stating that although section 1360(a) did "grant States jurisdiction over private civil litigation involving reservation Indians in state court," section 1360(a) did "not ... grant [the states] general civil regulatory power." *Cabazon*, 480 U.S. at 208, 107 S.Ct. 1083. In *Cabazon*, the State of California sought to enforce on the reservation a state statute that provided rules for conducting certain gaming operations. *Id.* at 205, 107 S.Ct. 1083 (noting that the statute at issue did "not entirely prohibit the playing of bingo but permits it when the games are operated and staffed by members of designated charitable organizations who may not be paid for their services"). The tribe sued, contending that the state law could not be enforced against its on-reservation gaming activities. *Id.* at 206, 107 S.Ct. 1083. The Court agreed, and said that "when a State seeks to enforce a law within an Indian reservation under the authority of [Public Law] 280," a civil law is "applicable only as it may be relevant to private civil litigation in state court." *Id.*

Consistent with *Bryan* and *Cabazon*, we must determine whether the commitment statute is a civil law applicable to private litigation in state court, or an assertion of "general state civil regulatory control over Indian reservations." *Bryan*, 426 U.S. at 384, 96 S.Ct. 2102. Unfortunately, the

"distinction between state civil laws that may supply a rule of decision and state regulatory laws that cannot be enforced by virtue of Public Law 280 civil jurisdiction is hardly clear and has caused difficulty in application." Conference of Western Attorneys General, *American Indian Law Deskbook* 275 (Clay Smith ed., 4th ed.2008). This "dividing line" between private civil litigation and state regulation "is inevitably obscure, because adjudication of civil controversies normally entails the application of a body of legal rules that regulate private conduct." *Cohen's Handbook of Federal Indian Law* § 6.04[3][b], at 551 (Nell Jessup Newton et al. eds., LexisNexis 2005).

In a footnote in *Bryan*, the Court quoted a law review article that is helpful in discerning a dividing line between private litigation and civil regulation. *Bryan*, 426 U.S. at 384 n. 10, 96 S.Ct. 2102 (quoting Daniel H. Israel & Thomas L. Smithson, *Indian Taxation, Tribal Sovereignty and Economic Development*, 49 N.D. L.Rev. 267, 296 (1973)). This article notes that "Congress intended 'civil laws' to mean those laws which have to do with private rights and status." *Id.* (quoting Israel & Smithson, *supra*, at 296). Thus, according to the quoted article, " 'civil laws ... of general application to private persons or private property' would include the laws of contract, tort, marriage, divorce, insanity, descent, etc." *Id.* (alterations in original) (quoting Israel & Smithson, *supra*, at 296). The article distinguishes those "private" laws from "laws declaring or implementing the states' sovereign powers, such as the power to tax, grant franchises, etc." *Id.* (quoting Israel & Smithson, *supra*, at 296). Applying this analysis to Minnesota's civil commitment statute leads to the conclusion that the statute falls within the express grant of jurisdiction to the State under Public Law 280.

We reach this conclusion based on the language of our civil commitment statute. The plain terms of the statute governing the proceedings, Minn.Stat. § 253B.185, provide for adjudicatory "commitment proceedings" that are held to determine the *status* of an individual as a sexually dangerous person or sexual psychopathic personality. Minn.Stat. § 253B.185, subd. 1. The commitment statute does not operate to regulate or proscribe behavior. Rather, the statute applies only to those "who are mentally ill and dangerous to the public" and to those "who are alleged or found to be sexually dangerous persons." *Id.* As the court of appeals reasoned in this case, the State "is heavily involved in [sexually dangerous person] commitment," and "involuntary civil commitment, which significantly deprives an individual of his or her liberty," could be considered "one of the most extreme forms of regulation conducted by the state." *Johnson,* 782 N.W.2d at 279–80. The issue in dispute in these proceedings, however, is not the regulation of behavior but the condition or status of a private individual.

The purpose of these proceedings, as set forth in the statute, also supports this distinction. The primary purpose of commitment proceedings is to determine whether a person meets the statutory definition of a sexual psychopathic personality or a sexually dangerous person. *See id.* These proceedings by nature are thus determinations of a person's status as one who "has engaged in a course of harmful sexual conduct" or "has manifested a sexual, personality, or other mental disorder or dysfunction and as a result, is likely to engage in acts of harmful sexual conduct." Minn.Stat. § 253B.02, subd. 18c; *see also Black's Law Dictionary* 1542 (9th ed.2009) (defining "status" as a "person's legal condition insofar as it is imposed by the law without the person's consent"). In fact, by the plain terms of the commitment statute, it is only "[a]fter a final *determination* that a patient *is a sexually dangerous person* " that a court "order[s] commitment for an indeterminate period of time." Minn.Stat. § 253B.185, subd. 1(e) (emphasis added).

In sum, through chapter 253B the State of Minnesota does not seek to impose its sovereign authority onto Indian country. Rather, the State—through enforcement of the statute—seeks to adjudicate the status or condition of private individuals. Because the commitment statute requires a judicial determination of the condition of private individuals, we conclude that it is more akin to the laws of "contract, tort, marriage, divorce, insanity, [or] descent," than to an assertion of sovereignty like "the power to tax [or] grant franchises." *Bryan,* 426 U.S. at 384 n. 10, 96 S.Ct. 2102 (quoting Israel & Smithson, *supra,* at 296) (internal quotation marks omitted).[5]

---

5. In her concurrence, Justice Meyer reaches the opposite result relying on *State ex rel. Department of Human Services v. Whitebreast,* 409 N.W.2d 460, 463 (Iowa 1987). In *Whitebreast,* a divided Iowa Supreme Court rejected the characterization of state-initiated child support recovery proceedings as private causes of action subject to Public Law 280 because the applicable "provisions reveal[ed] pervasive state control." *Whitebreast,* 409 N.W.2d at 463. But the child support recovery proceedings are not analogous to the status determinations at issue in this case, so *Whitebreast*'s applicability here is limited.

Further, the *Whitebreast* court reasoned that the "collection scheme contemplated by" the child support recovery statute in controversy, "if not technically amounting to taxation, certainly bears a striking resemblance" to taxation. *Id.* at 464. Notably, as expressed by the court in *Whitebreast, Bryan* expressly precludes "general civil regulatory powers, *including taxation* " from section 1360(a)'s grant of civil jurisdiction. *Whitebreast,* 409 N.W.2d at 464 (quoting *Bryan,* 426 U.S. at 390, 96 S.Ct. 2102 (emphasis added)). The civil commitment statute in question here, in

The result we reach here with regard to chapter 253B is in accord with results reached in other states. For example, the Wisconsin Supreme Court held that section 1360(a) expressly granted a state court subject matter jurisdiction to civilly commit a tribal member as a sexually dangerous person. *In re Commitment of Burgess*, 262 Wis.2d 354, 665 N.W.2d 124, 133 (2003); *see also Burgess v. Watters*, 467 F.3d 676, 687 (7th Cir.2006) (holding that the Wisconsin Supreme Court did not unreasonably apply clearly established federal law in determining that Public Law 280 conferred civil jurisdiction to the State of Wisconsin to commit Burgess, an enrolled member of an Indian tribe, as a sexually violent person). Applying *Cabazon*, the Wisconsin Supreme Court determined that its commitment laws were subject to Public Law 280's express grant of civil jurisdiction. *Burgess*, 665 N.W.2d at 132. The court reasoned that "the adjudication of Burgess's mental health is a status determination, which is more similar to adjudications like those involving insanity, rather than regulations such as the power to tax." *Id.* at 133.

Similarly, in *Doe v. Mann*, 415 F.3d 1038, 1060 (9th Cir.2005), the Ninth Circuit determined that the State of California had subject matter jurisdiction to adjudicate the parental rights of a tribal member. The Ninth Circuit stated, "[T]he Supreme Court's language in

*Bryan* and *Cabazon* gives us pause: those two cases intimate that Public Law 280's civil jurisdiction is limited to disputes between *private* parties." *Id.* at 1058 (emphasis in original). The Ninth Circuit nonetheless found that "resting [its] analysis simply on the Supreme Court's references to private disputes would create a tortured result." *Id.* at 1059. This was so because "[a]t the heart of the dependency proceedings is a dispute about the status of the child, a private individual." *Id.* Accordingly, the Ninth Circuit concluded that "child dependency proceedings are more analogous to the 'private legal disputes' that fall under a state's Public Law 280 jurisdiction than to the regulatory regimes at issue in *Bryan* and *Cabazon.*" *Id.*

Appellants assert that because the State of Minnesota, through Cass County, is a participant in the commitment proceedings, *Bryan* automatically excludes appellants' commitments from the definition of "private civil litigation." We disagree. Chapter 253B is not limited to government-initiated commitment proceedings. To the contrary, the statute specifically provides that private persons can initiate proceedings to civilly commit another individual. *See* Minn.Stat. § 253B.07, subd. 2(a) ("Any interested person ... may file a petition for commitment in the district court of the county of financial responsibility or the county where the proposed pa-

contrast, unquestionably does not "bear[ ] a striking resemblance" to taxation and *Whitebreast* is therefore inapposite. Finally, several courts have rejected the conclusory analysis of the *Whitebreast* decision even in the child support context. *See, e.g., Cnty. of Inyo v. Jeff*, 227 Cal.App.3d 487, 277 Cal.Rptr. 841, 845 (1991) ("We believe that the reasoning in [*Whitebreast* ] ... is faulty. Collection of child support is neither taxation nor regulatory."); *Anderson v. Beaulieu*, 555 N.W.2d 537, 540 (Minn.App.1996) ("We have specifically

declined to adopt the *Whitebreast* court's reasoning....."); *Becker Cnty. Welfare Dep't v. Bellcourt*, 453 N.W.2d 543, 544 (Minn.App. 1990) ("We are unpersuaded by the reasoning in *Whitebreast*. While [the relevant child support provision] does contain some regulatory aspects, ... the county is only acting on behalf of a private party who has assigned her rights to establish paternity and recover child support."). For all of these reasons, we reject the analysis in *Whitebreast*.

tient is present.").[6] Within the context of commitment as a sexually dangerous person, the statute requires that the county attorney prepare the petition after a determination by the county attorney that "good cause" exists for the matter to proceed. Minn.Stat. § 253B.185, subd. 1(b). But this involvement by the government does not alter the status determination the court is asked to make. That a governmental entity, the County in this case, initiates the proceedings likewise does not necessarily mean that the proceedings are regulatory in nature, nor convert what is essentially an adjudication of the condition of a private individual into government regulation. *See Doe,* 415 F.3d at 1059 (noting that the fact that the State is a party "does not transform what is an adjudicatory proceeding involving private parties into a regulatory proceeding").

Based on the terms of Minnesota's civil commitment statute, we hold that appellants' commitments were civil causes of action subject to Congress' express grant of civil jurisdiction under section 1360(a), and that the district court therefore had jurisdiction to commit appellants.

## II.

 As an alternative to its argument that Congress expressly consented to jurisdiction, the County contends, and the court of appeals held, that the commitments were within the State's jurisdiction because the state's exceptional interests justify the exercise of jurisdiction over appellants. *Johnson,* 782 N.W.2d at 281. Minnesota's "jurisdiction is pre-empted ... if it interferes or is incompatible with federal and tribal interests reflected in federal law, unless the state interests at

stake are sufficient to justify the assertion of state authority." *New Mexico v. Mescalero Apache Tribe,* 462 U.S. 324, 334, 103 S.Ct. 2378, 76 L.Ed.2d 611 (1983), *quoted in Davis,* 773 N.W.2d at 72. In making this assessment, "[t]he tradition of Indian sovereignty over the reservation and tribal members must inform" the conclusion as to "whether the exercise of state authority has been pre-empted by operation of federal law." *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 143, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980). But Supreme Court cases "make clear that the Indians' right to make their own laws and be governed by them does not exclude all state regulatory authority on the reservation. State sovereignty does not end at a reservation's border." *Nevada v. Hicks,* 533 U.S. 353, 361, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001). Thus, in "exceptional circumstances," a State may "assert jurisdiction over the on-reservation activities of tribal members." *Cabazon,* 480 U.S. at 215, 107 S.Ct. 1083 (quoting *Mescalero,* 462 U.S. at 331–32, 103 S.Ct. 2378) (internal quotation marks omitted). The question of whether "exceptional circumstances" allow State jurisdiction requires us to " 'weigh the competing interests at stake' within the 'specific factual context' presented." *Davis,* 773 N.W.2d at 72 (quoting *R.M.H.,* 617 N.W.2d at 64).

Applying this test, we look first to the federal interest and analyze the impact appellants' commitments have on that federal interest. *Id.* The federal interest lies in "protecting a tribe's retained sovereignty over its members and its territory." *R.M.H.,* 617 N.W.2d at 64. As such, the federal goals of promoting "tribal self-government, self-sufficiency, and economic de-

---

**6.** "Interested person" means "an adult, including but not limited to, a public official, including a local welfare agency ... and the legal guardian, spouse, parent, legal counsel, adult child, next of kin, or other person designated by a proposed patient." Minn.Stat. § 253B.02, subd. 10.

velopment are overriding." *Id.* (citing *Cabazon,* 480 U.S. at 216, 107 S.Ct. 1083).

Appellants contend that the federal interest is compelling in this context because of the Indian Health Care Improvement Act, which provides for the health care of Indians. Pub.L. No. 94–437, 90 Stat. 1400 (1976) (codified as amended at 25 U.S.C. §§ 1601–83 (2006)). The enactment of the Act reflects a "major national goal of the United States" to "provide the resources, processes, and structure that will enable Indian tribes and tribal members to obtain the quantity and quality of health care services and opportunities that will eradicate the health disparities between Indians and the general population of the United States;" as well as to raise "the health status of Indians ... to the highest possible level." 25 U.S.C.A. § 1601(2)–(3) (West Supp.2011). Congress acknowledged that providing for Indian health care is "consonant with and required by the Federal Government's historical and unique legal relationship with, and resulting responsibility to, the American Indian people." 25 U.S.C.A. § 1601. The Act specifically provides for behavioral healthcare for Indians. *See* 25 U.S.C. §§ 1665–1665m. It requires the Indian Health Service to "provide a program of comprehensive behavioral health, prevention, treatment, and aftercare which ... shall include ... acute detoxification, psychiatric hospitalization, residential, and intensive outpatient treatment" for "members of Indian tribes." 25 U.S.C.A. § 1665c(a)(1)–(a)(2).

As noted by appellants, the district court in *White v. Califano* relied on the Indian Health Care Improvement Act as one basis to find that federal law preempted South Dakota's jurisdiction to commit a mentally ill tribal Indian residing on her reservation. 437 F.Supp. 543, 557–58 (D.S.D.1977), *aff'd,* 581 F.2d 697 (8th Cir. 1978). Relying on the extensive federal statutory provisions for the health care of Indians, the court found that "Congress has unambiguously declared that the federal government has a legal responsibility to provide health care to Indians." *White,* 437 F.Supp. at 555. The court explained that "[t]his stems from the 'unique relationship' between Indians and the federal government, a relationship that is reflected in hundreds of cases and is further made obvious by the fact that one bulging volume of the U.S.Code pertains only to Indians." *Id.* The court also held that "applying the procedures of an involuntary commitment to an Indian person in Indian country would require severe intrusions into the tribe's vestigial sovereignty." *Id.* at 549.[7]

But the Indian Health Care Improvement Act contains no express statement of intent to preclude state jurisdiction over the civil commitment of sexually dangerous tribal members. Nor does the Act provide for the commitment of Indians as sexually dangerous persons.

Moreover, we believe that Congress has more directly expressed its intent for *states* to have primary responsibility for civil commitments of sexually dangerous persons. Even though Congress has pro-

---

**7.** The facts of *White* make that case markedly different from this one in terms of the level of intrusion onto tribal sovereignty. Most significant is the fact that the tribal member in *White,* Florence Red Dog, was removed from her home on her reservation by a federal Indian Health Service Worker and involuntarily committed. 437 F.Supp. at 545. There were no factual findings that Red Dog ever left her home or engaged in any off-reservation conduct. *See id.* The conduct in *White* therefore implicates a much greater intrusion on sovereignty than the commitments in this case, where both off- and on-reservation conduct is concerned.

vided for the civil commitment of *federal* prisoners, *see* 18 U.S.C. § 4248 (2006), the Supreme Court has acknowledged that the states " 'have traditionally exercised broad power to commit persons found to be mentally ill.' " *United States v. Comstock,* —— U.S. ——, 130 S.Ct. 1949, 1962, 176 L.Ed.2d 878 (2010) (quoting *Jackson v. Indiana,* 406 U.S. 715, 736, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972)). In fact, 18 U.S.C. § 4248, which is similar to Minnesota's civil commitment law, requires the federal government to "release the [sexually dangerous] person to the appropriate official of the State in which the person is domiciled or was tried if such State will assume responsibility for his custody, care, and treatment." *Id.* § 4248(d). Section 4248 also requires federal officials to "make all reasonable efforts to cause such a State to assume such responsibility." *Id.* § 4248(d). Thus, "Congress intends the states rather than the federal government to have primary responsibility for the civil commitment of sexually dangerous individuals." *United States v. Tom,* 565 F.3d 497, 508 (8th Cir.2009). We therefore conclude that "there is no federal regulatory scheme so pervasive as to preclude state jurisdiction," in the context of the civil commitment of sexually dangerous persons, even when those persons are Indians. *R.M.H.,* 617 N.W.2d at 65.

Appellants contend, however, that their commitments unduly infringe upon the federal goal of promoting tribal self-governance. The Supreme Court "has emphasized that 'there is a significant geographical component to tribal sovereignty' and has 'consistently guarded the authority of Indian governments over their reservations.' " *Id.* at 64 (quoting *Bracker,* 448 U.S. at 151, 100 S.Ct. 2578). Supreme Court precedent also suggests that "tribal interest in self-governance is limited to relations between a tribe and its own members, not all Indians generally." *Id.* (citing *Duro v. Reina,* 495 U.S. 676, 695, 110 S.Ct. 2053, 109 L.Ed.2d 693 (1990); *Washington v. Confederated Tribes of the Colville Indian Reservation,* 447 U.S. 134, 160–61, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980); *Oliphant v. Suquamish Indian Tribe,* 435 U.S. 191, 211, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978)). This is because "activities conducted outside the reservation present different considerations" than on-reservation activities, and diminish Congress' interest in tribal sovereignty. *Jones,* 411 U.S. at 148–49, 93 S.Ct. 1267; *see also Davis,* 773 N.W.2d at 74 (finding a diminished federal interest when an Indian engaged in conduct on a reservation of a *band* of which he was not a member); *R.M.H.,* 617 N.W.2d at 64–65 (finding a diminished federal interest when an Indian engaged in conduct on a reservation of a *tribe* of which he was not a member).

This case involves both on- and off-reservation conduct. The parties agree that appellants' harmful sexual conduct and the other acts that comprised the district courts' findings supporting appellants' commitments occurred both on and off the reservations of the tribes in which appellants were members. Because some of appellants' conduct occurred off the reservations of which appellants were members, both our own and Supreme Court precedent confirm that the federal interest is decreased. *See Mescalero,* 411 U.S. at 148–49, 93 S.Ct. 1267; *Davis,* 773 N.W.2d at 74; *R.M.H.,* 617 N.W.2d at 64–65.

Removing members from their reservations to commit them undoubtedly affects those tribes.[8] But appellants have not

---

8. This concern is mitigated in Johnson's case because the record does not reflect that he ever lived on the Bois Forte reservation, the reservation of the band of which he is a member.

demonstrated in this case that the commitment of tribal members in off-reservation state facilities, based at least in part on their off-reservation conduct, necessarily undermines tribal sovereignty. Appellants do not present any specific argument addressing this factor, do not demonstrate that the Leech Lake and Bois Forte Bands have a tradition of sovereignty in this area of law, and do not show that either the Leech Lake or Bois Forte Bands have laws or facilities to provide treatment for sexually dangerous persons. Thus, appellants have not demonstrated that commitments of tribal members in this context "threaten[ ] the federal interest in encouraging tribal self-government" to a degree that would preclude state court jurisdiction. *R.M.H.*, 617 N.W.2d at 64.

In assessing the impact on the federal interests, we must also determine "whether state jurisdiction threatens the economic development and self-sufficiency" of the Leech Lake and Bois Forte Bands. *Id.* at 65. The County argues that appellants' commitments actually encourage tribal self-sufficiency and economic development because the Bois Forte and Leech Lake Bands "benefit from the state assuming the costs of housing and rehabilitating its sexually dangerous members." Appellants make no specific argument concerning the impact of the civil commitment laws on tribal economic development and self-sufficiency and we discern no such impact from the record here. Finally, we note that the Leech Lake and Bois Forte Bands have expressed no opinion to this court on whether appellants' commitments undermine their sovereignty, self-governance, or economic self-sufficiency.

After analyzing the impact of the regulation on the federal interests, we examine the State interests served through enforcement of the statute at issue. *See R.M.H.*, 617 N.W.2d at 65. The State of Minnesota's interest in enforcing chapter 253B is significant. We have said in other contexts that Minnesota's interest in enacting civil commitment laws lies "in both protecting the public from sexual violence and rehabilitating the mentally ill." *Linehan IV*, 594 N.W.2d at 872. These state interests are "compelling." *Id.; cf. Davis*, 773 N.W.2d at 72 (concluding that the state has a "strong interest" in ensuring traffic safety); *Jones*, 729 N.W.2d at 14–15 (Anderson, G. Barry, J., concurring) (noting with respect to sex offender registration "it seems clear that if the state can ever reach the on-reservation conduct of tribal members ... it can do so here"); *Bendorf v. Comm'r of Pub. Safety*, 727 N.W.2d 410, 416–17 (Minn.2007) (holding that the "state has a compelling interest" in protecting "the citizens of Minnesota" from those who "pose a severe threat to the[ir] health and safety" (citation omitted) (internal quotation marks omitted)); *In re Blodgett*, 510 N.W.2d 910, 924 (Minn.1994) (finding that the State has a "compelling interest in protecting the public from violent sexual assaults"); *State v. Hershberger*, 462 N.W.2d 393, 399 (Minn.1990) (finding that the strength of the State's interests in protecting the public "cannot be disputed").[9] These interests are directly served through the civil commitment statute because, under Minn.Stat. § 253B.02, subd. 18c(3), the determination as a "sexually dangerous person" specifically requires findings that the person is likely to reoffend and harm the public.

---

9. In his concurrence, Justice Page cites a recent report from the Office of the Legislative Auditor and he contends that in light of that report, "it is disingenuous to claim that the State has a strong interest in rehabilitat-

ing sexually dangerous persons." But the fact that the State may not have accomplished its objective of rehabilitating sexually dangerous persons does not negate the legitimacy of the State's interest in doing so.

When we "weigh the competing interests at stake," *R.M.H.,* 617 N.W.2d at 64, we agree with the court of appeals that the balance tips in favor of the enforcement in state court of chapter 253B under the circumstances present here. *See Johnson,* 782 N.W.2d at 281. Specifically, in light of the exceptionally strong State interests presented, the fact that Congress has not pervasively regulated this area of the law, and the minimal intrusion on tribal sovereignty, we conclude that Minnesota's enforcement of chapter 253B is not preempted. We therefore hold that the state has jurisdiction to civilly commit appellants.

Affirmed.

PAGE, Justice (concurring).

I join Justice Meyer's concurrence. I write separately because although I agree with the court that the State's interests justify jurisdiction even without an express grant from Congress, I disagree with the court's reliance on "rehabilitating the mentally ill," *In re Linehan (Linehan IV),* 594 N.W.2d 867, 872 (Minn.1999), as an "exceptionally strong state interest" justifying the exercise of jurisdiction here, *see California v. Cabazon Band of Mission Indians,* 480 U.S. 202, 215, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987).

In light of the recent report released by the Office of the Legislative Auditor (OLA), it is disingenuous to claim that the State has a strong interest in rehabilitating sexually dangerous persons. *See* Office of the Legislative Auditor, State of Minnesota, *Evaluation Report: Civil Commitment of Sex Offenders* (2011).[10] In fact, the OLA found that the Minnesota Sex Offender Program (MSOP) "is at the low end of the range of treatment hours considered to be best practices for sex offender civil commitment programs," has "generally delivered less treatment than civil commitment programs in other states," and should "provide more treatment hours." *Id.* at 64–65. The report warns, "Civilly committed sex offenders retain certain civil rights, including the right to treatment. Without an adequate treatment program, Minnesota could face a legal challenge." *Id.* at x. The State's disinterest in rehabilitation is reinforced by the fact that "no sex offender has ever been discharged from MSOP." *Id.* at 19.[11]

I agree that we have jurisdiction to commit appellants but, in light of the OLA's findings, I cannot agree that Minnesota views the rehabilitation of sexually dangerous persons as an "exceptionally strong interest." As a result, we should not rely on this as a basis for jurisdiction.[12]

MEYER, Justice (concurring).

I concur in the decision of the court under Part II and would hold that the State has jurisdiction to civilly commit appellants. I write separately because I do not agree with the majority's analysis under Part I and would not base our decision on jurisdiction under 28 U.S.C. § 1360(a) (2006).

10. Available at http://www.auditor.leg.state.mn.us/ped/pedrep/ccso.pdf (last visited May 25, 2011).

11. One offender was conditionally released. According to the OLA report, "[t]hat individual was returned to MSOP due to technical violations of his release conditions. He subsequently died while at an MSOP facility." *Id.*

12. I do not argue, as the court asserts, that the State's interest is minimized because it has not *accomplished* its objective. Rather, the OLA's report suggests, and I conclude, that the State's interest is minimized because the State's actions indicate that the State is not *interested* in rehabilitation.

Public Law 280 expressly confers upon Minnesota "jurisdiction over civil causes of action between Indians or to which Indians are parties ... to the same extent that such State has jurisdiction over other civil causes of action," and provides that "those civil laws of such State that are of general application to private persons or private property shall have the same force and effect within such Indian country as they have elsewhere within the State." 28 U.S.C. § 1360(a). In *Bryan v. Itasca County*, the Supreme Court found that "the primary intent of [section 1360(a)] was to grant jurisdiction over private civil litigation involving reservation Indians in state court." 426 U.S. 373, 385, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976). The Court indicated that section 1360(a) "seems to have been primarily intended to redress the lack of adequate Indian forums for resolving private legal disputes between reservation Indians." *Bryan*, 426 U.S. at 383, 96 S.Ct. 2102.

Unfortunately, the Court "has not had much to say about how to determine whether a law seeks to adjudicate private rights, and thus falls within the bounds of [section 1360(a)], or is a regulatory scheme." *Burgess v. Watters*, 467 F.3d 676, 686 (7th Cir.2006). However, *Bryan* did hint in a footnote at which laws are subject to Public Law 280's express grant of civil authority. Quoting a law review article, the Court stated that " 'Congress intended 'civil laws' to mean those laws which have to do with private rights and *status.*' " *Bryan*, 426 U.S. at 384–85 n. 10, 96 S.Ct. 2102 (emphasis added) (quoting Daniel H. Israel and Thomas L. Smithson, *Indian Taxation, Trial Sovereignty and Economic Development*, 49 N.D. L.Rev. 267, 296 (1973) (internal quotation marks omitted)). Therefore, " 'civil laws ... of general application to private persons or private property' would include the laws of contract, tort, marriage, divorce, insanity, descent, etc." *Bryan*, 426 U.S. at 384–85

n. 10, 96 S.Ct. 2102 (citation omitted). The Court indicated that such laws are civil adjudicatory and are subject to Public Law 280's express grant of jurisdiction. *See id.* (citation omitted).

Applying this analysis to Minnesota's commitment of sexually dangerous persons leads me to conclude that sexually dangerous person (SDP) commitment proceedings cannot be considered private causes of action to which an Indian is a party under section 1360(a) of Public Law 280. While, as the majority states, the commitment statute does not operate to regulate or proscribe behavior, the commitment provisions in our statute certainly provide for adjudicated proceedings. They also appear to constitute "an implementation of the state's sovereign responsibilities to protect its citizens from sexually dangerous persons and to treat and care for those persons." *In re Civil Commitment of Johnson*, 782 N.W.2d 274, 279–80 (Minn. App.2010). As the court of appeals in this case reasoned, the State is "heavily involved in SDP commitment" and "involuntary civil commitment, which significantly deprives an individual of his or her liberty, is one of the most extreme forms of regulation conducted by the State." *Id.* Unlike civil commitments generally, where any person may petition for commitment, SDP commitment proceedings may *only* be instituted by the county attorney. Minn. Stat. § 253B.185, subd. 1(b) (2010). Additionally, the rights of patients committed as sexually dangerous persons may be severely limited by the State. Minn.Stat. § 253B.185, subd. 7(b) (2010). Statutory rights that may be limited include personal privacy, private communications, retention and use of personal property, management of personal financial affairs, meeting with visitors, corresponding with others, and making telephone calls. *Id.* These rights are subject to greater limitation for a person committed as a SDP than for a person who is civilly committed.

Further, the Court in *California v. Cabazon Band of Mission Indians* determined that *Bryan* "interpreted [section 1360(a)] to grant States jurisdiction over *private* civil litigation involving reservation Indians in state court." *California v. Cabazon Band of Mission Indians,* 480 U.S. 202, 208, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987) (emphasis added). Relying on *Cabazon*'s reference to "private" litigation, the Iowa Supreme Court has rejected the characterization of *state*-initiated child support recovery proceedings as civil/adjudicatory under Public Law 280 because the applicable "provisions reveal pervasive state control." *State ex rel. Dep't Human Servs. v. Whitebreast,* 409 N.W.2d 460, 463 (Iowa 1987). The Iowa Supreme Court agreed with the district court's statement that "[c]learly it is the state which initiated this action and the state which will benefit by payments to the state treasury. It is hard to imagine this case as a 'private civil cause of action involving Indians.'" *Id.* at 464 (alteration in original). Similarly, *it is* difficult to characterize these *state*-initiated actions, which are intended to benefit the public at large and not a private individual and which are conducted pursuant to Minnesota's sovereign police powers, as private causes of action to which Indians are parties.

For these reasons, I do not join in Part I of the majority opinion.

PAGE, Justice (concurring).

I join in the concurrence of Justice Meyer.

ANDERSON, PAUL H., Justice (concurring).

I join in the concurrence of Justice Meyer.